**John KEFFER, Appellant**

v.

**BOB NOLAN'S AUTO SERVICE, INC. and James Gladu and AAA Mid–Atlantic, Inc., Appellees.**

Superior Court of Pennsylvania.

Argued Oct. 2, 2012.

Filed Nov. 26, 2012.

Reargument Denied Jan. 31, 2013.

Joan D. Gallagher, Philadelphia, for appellant.

Peter A. Callahan, Philadelphia, for AAA, appellee.

Carl D. Buchholz, III, Philadelphia, for Bob Nolan's and Gladu, appellees.

BEFORE: STEVENS, P.J., FORD ELLIOTT, P.J.E., and ALLEN, J.

OPINION BY STEVENS, P.J.

Appellant, John Keffer (hereinafter "Mr. Keffer") appeals from the October 25, 2011, Order entering judgment on the jury's verdict and denying his motion for post trial relief and the February 25, 2011, Order granting the motion of AAA Mid–Atlantic, Inc., (hereinafter "AAA") for summary judgment,[1] both of which were entered in the Court of Common Pleas of

1.  On March 22, 2011, the Honorable George W. Overton (hereinafter "Judge Overton") denied Mr. Keffer's Motion for Reconsideration, and on April 21, 2011, he also denied Mr. Keffer's request to certify the Order granting AAA summary judgment.

Philadelphia County. Upon our review of the record, we affirm.

The Honorable Marlene Lachman (hereinafter "Judge Lachman") set forth the facts and procedural history herein as follows:

This case involved a September 24, 2007, rear-end motor vehicle collision in Philadelphia on southbound Interstate Route 95 ("I95 South"). Defendant James Gladu[2] was operating a 2007 International Navistar 4300 flatbed tow truck owned by Defendant Bob Nolan's Auto Service, Inc. ("Bob Nolan's").[3] Bob Nolan's was an independent contractor for Defendant AAA Mid–Atlantic, Inc. ("AAA"), and was responsible for providing roadside assistance to disabled AAA members on portions of I–95.

On September 24, 2007, while in the course and scope of his employment with Bob Nolan's, [Mr.] Gladu received a call from AAA stating that one of its members had a flat tire on the shoulder of northbound I–95 and required assistance. [Mr.] Gladu entered Southbound I–95 at the Street Road entrance and drove in the left lane looking for, and eventually locating, the disabled vehicle on I–95 North. [Mr.] Keffer was operating a van in the left lane approximately one-and-a-half miles behind [Mr.] Gladu. Mr. Gladu was approximately one mile before an emergency turnaround in the grass median separating North and South I–95. He intended to use it to make a[U]-turn to get to the motorist stranded on I–95 North. [Mr.] Gladu turned on the bar lights on top of the cab of his truck and activated his left turn signal.

[Mr.] Gladu began breaking as he approached the opening in the median strip. At the opening in the median there was a sign stating, "Emergency and Authorized Vehicles Only."

As [Mr.] Gladu was turning into the median strip turn-around, he felt an impact as [Mr. Keffer's] van struck the rear of Mr. Gladu's truck. [Mr. Keffer] argued to the jury that the rear of [Mr.] Gladu's truck struck [Mr. Keffer's] van while the van was in the middle lane of traffic. The jury, however, found that both vehicles were in the left lane and that the collision occurred when the rear half of the tow truck was in the left lane and the front half of the tow truck was in the median turn-around.

After the impact, [Mr. Keffer's] van continued traveling, crossed the median strip, struck the guardrail separating the northbound lanes of I–95 and the median, and rolled over, trapping [Mr. Keffer] inside the van. [Mr. Keffer] sustained very serious injuries and underwent multiple surgeries. He contended at trial that he was disabled from returning to his previous employment as a steamfitter.

[Mr. Keffer] commenced this action against [Appellees] Gladu, Bob Nolan's and AAA on September 22, 2009. AAA was dismissed from the case on February 7, 2011, when Judge George W. Overton granted AAA's motion for summary judgment. Judge Overton is writing an Opinion supporting the grant of summary judgment.

The trial of this case began on May 27, 2011, with the selection of a jury. After 14 days of trial, on June 17, 2011, the jury returned with a verdict that [Mr.] Gladu was not negligent. Because Bob Nolan's liability was merely vicari-

---

2. Hereinafter "Mr. Gladu."

3. Hereinafter "Bob Nolan's." At times, we will refer to Mr. Gladu and Bob Nolan's collectively as "Appellees."

ous, the exoneration of [Mr.] Gladu exonerated Bob Nolan's as well.

[Mr. Keffer] filed a timely post-trial motion for relief seeking a judgment notwithstanding the verdict or a new trial in the alternative. After briefing and argument, the court denied [Mr. Keffer's] post-trial motion and entered judgment on the jury's verdict on October 25, 2011.

[Mr. Keffer] filed a timely notice of appeal to the Superior Court. The [t]rial [c]ourt issued an Order for a Pa. R.A.P. 1925(b) Statement of the rulings and errors [Mr. Keffer] intended to pursue on appeal. [Mr. Keffer] filed a timely Pa.R.A.P. 1925(b) Statement on December 2, 2011. There was a typographical error in paragraph 3 of the Statement and the [c]ourt permitted [Mr. Keffer] to file a corrected Amended Statement on December 5, 2011 . . . .

Judge Lachman Opinion, field June 6, 2012, at 1–3. (footnote omitted).

In his brief, Mr. Keffer raises the following Statement of the Questions Involved:

1. Whether Judge Lachman violated the coordinate jurisdiction rule and committed an error of law by granting [Appellees'] Motion *in Limine* and taking judicial notice that a private commercial tow truck was authorized to execute an illegal U-turn on I–95?

2. Whether Judge Lachman erred by granting a nonsuit in favor of [ ] [Bob Nolan's] despite [Appellees'] admissions as to the lack of supervision and training?

3. Whether Judge Lachman erred by denying [Mr. Keffer's] Request for a Directed Verdict in light of [Appellees'] admissions on the record and Mr. Gladu's clear failure to "insure the safety of all motorists?"

4. Whether Judge Lachman erred by allowing expert Stephen Fenton to testify despite the fact that (1) [Appellees] agreed that the underlying data that Mr. Fenton's conclusions were based on, the PC–Crash data, would not be offered into evidence and (2) Mr. Fenton submitted a supplemental report that not only introduced a new theory that was not based on any calculations but was untimely?

5. Whether Judge Lachman erred by allowing [Appellees] to offer inadmissible opinions of Trooper Martin in violation of a Court Order granting [Appellees'] own motion to restrict and preclude the opinions of Trooper Martin?

6. Whether Judge Overton committed an error of law and abused his discretion by resolving all factual disputes in favor of the moving party for summary judgment, AAA [ ], and holding that AAA cannot be held vicariously liable because Bob Nolan's [ ] was an independent contractor?

7. Whether Judge Overton erred by dismissing all claims of direct negligence against AAA despite substantial record evidence presented to the [c]ourt that raised disputed issues of material fact as to AAA's direct liability?

Brief for Mr. Keffer at 4–5. We will consider these issues in turn.

In his first issue, Mr. Keffer maintains that Judge Lachman erred in taking judicial notice that the flatbed tow truck which Mr. Gladu had been operating was an "authorized vehicle" permitted to use the median opening and that "his actual U-turn was a 'legal movement,'" as such a determination was an issue of fact and "[t]his error decimated [Mr.] Keffer's case." Mr.

Keffer's Brief at 13–14. Mr. Keffer reasons, *inter alia,* that under 75 Pa.C.S. § 6107 and Section 15.3 of the Code, which implements the statute, "a vehicle can only be designated as authorized to execute a U-turn if the vehicle is used for public service or governmental purposes and can only exercise special privileges when it is performing the work which is the basis for the designation (as a public or governmental service vehicle), only when those privileges can be executed in a safe manner, and only if every precaution is made to insure the safety of all motorists." Brief for Mr. Keffer at 17.

In reviewing a trial court's interpretation of statutory language, we are mindful of the well-settled rule that "[s]tatutory interpretation implicates a question of law." *Commonwealth v. Gonzalez,* 10 A.3d 1260, 1261–1262 (Pa.Super.2010), *appeal denied,* 610 Pa. 616, 21 A.3d 1190 (2011). Thus, our scope of review is plenary, and our standard of review is *de novo. Commonwealth v. Van Aulen,* 952 A.2d 1183, 1184 (Pa.Super.2008), *appeal denied,* 600 Pa. 749, 965 A.2d 245 (2009).

In determining the meaning of a statute, we are obliged to consider and give effect to the intent of the legislature. Courts may disregard the statutory construction rules only when the application of such rules would result in a construction inconsistent with the manifest purpose of the General Assembly. *Commonwealth v. Marion,* 981 A.2d 230, 242 (Pa.Super.2009). As with all issues involving statutory interpretation, we must refer to the Statutory Construction Act, 1 Pa.C.S. § 1901–1991. Section 1921 provides in pertinent part:

(a) The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions.

(b) When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

(c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

1 Pa.C.S. § 1921.

We are also mindful of the premise that "when the legislature adopts a statute it does so with full knowledge of existing statutes relating to the same subject," and that "statutes or parts of statutes that relate to the same persons or things or to the same class of persons or things are to be construed together, if possible." *Commonwealth v. Hansley,* 994 A.2d 1150, 1152–1153 (Pa.Super.2010) (quoting *Hutskow v. Washowich,* 156 Pa.Cmwlth. 655, 628 A.2d 1202, 1207 (1993) and *Casiano v. Casiano,* 815 A.2d 638, 642 (Pa.Super.2002)).

*Commonwealth v. Dixon,* 53 A.3d 839, 842–843 (Pa.Super.2012).

■ We now turn to an analysis of the statutes relevant herein. 75 Pa.C.S. § 102, defines "authorized vehicle" generally as follows:

"AUTHORIZED VEHICLE" A vehicle or type of vehicle, other than an emergency vehicle, for which special operating or equipment privileges are given by law or regulation of the department based on design and utility for work within a highway.

75 Pa.C.S.A. § 102.

75 Pa.C.S.A. § 6107, entitled **designation of authorized vehicles by department**[4] provides:

The department may designate any vehicle or group of vehicles as authorized vehicles upon a finding that the vehicle is used in the performance of public service or governmental functions. Duly authorized vehicles shall be exempted from certain provisions of this title as specified in regulations promulgated by the department.

75 Pa.C.S.A. § 6107.

The regulations issued by DOT under Section 6107 can be found at 67 Pa.Code §§ 15.1–15.3. Section 15.1 indicates that the following chapter establishes the types of vehicles considered authorized vehicles under 75 Pa.C.S. §§ 102, 4572(b) and 6107, and establishes special operating privileges for authorized vehicles. Specifically, Section 15.2 reads in pertinent part as follows:

The vehicles enumerated in this section are designated as authorized vehicles of the type indicated. They may be equipped with one or two flashing or revolving yellow lights as provided in 75 Pa.C.S. § 4572(b) (relating to flashing or revolving yellow lights), and as defined in Chapter 173 (relating to flashing or revolving lights on emergency and authorized vehicles), except that school

buses shall be equipped with red and amber flashing lights as defined in 75 Pa.C.S. § 4552 (relating to general requirements for school buses). The flashing or revolving yellow lights on all authorized vehicles except school buses shall be activated only when the vehicle is performing the type of work which is the basis of the designation of the vehicle as an authorized vehicle, except lights on Type VI vehicles may be activated whenever an emergency condition requires police assistance. The enumeration of vehicles is as follows:

(1) *Type I.* Type I vehicles include the following:

(i) Highway construction and maintenance vehicles. Such vehicles shall include, but not be limited to, traffic-line-painting trucks, sign and signal maintenance trucks, dump trucks, street sweepers, mowers, highway inspection vehicles, and vehicles involved in traffic studies or investigations or right-of-way operations.

(ii) Vehicles which are used in utility operations.

(iii) Highway service vehicles such as, but not limited to, tow trucks and road-service vehicles.

(iv) Vehicles used to collect money from parking meters.

\*     \*     \*

67 Pa.Code § 15.2. In addition, § 15.3, entitled **Special operating privileges,** states that:

(a) *General.* The following types of authorized vehicles may exercise the special privileges indicated when they are performing the type of work which is the basis of the vehicle's designation as an authorized vehicle in § 15.2 (relating to types of authorized vehicles) and the

---

4. Refers to the Department of Transportation (DOT).

special privileges can be executed in a reasonable and safe manner:

(1) Any type of authorized vehicle, except Types III, VI and VII vehicles, may utilize special median openings on divided highways designated for emergency and authorized vehicles, if every precaution is taken to insure the safety of all motorists and pedestrians.

(2) Types I, II and IV authorized vehicles may drive on highways, or any part thereof, closed to the general public when they are performing the type of work which is the basis of the designation of the vehicle as an authorized vehicle in § 15.2, if the driving can be done in a reasonable and safe manner.

\*　　\*　　\*

67 Pa.Code § 15.3.

After determining the question of whether the tow truck Mr. Gladu had been operating at the time of the accident was an "authorized vehicle" under the applicable regulations was a legal issue as it involved statutory interpretation, Judge Lachman entered an Order on June 2, 2011, granting Bob Nolan's and Mr. Gladu's Motion *In Limine* requesting that she take judicial notice that the tow truck driven by Mr. Gladu was an "authorized" vehicle and permitted to use the median opening. In her Opinion, Judge Lachman set forth her reasoning in making that ruling as follows:

Because Mr. Gladu was on his way to rescue a stranded motorist on I–95 North, he was performing the highway service or road service mentioned in 67 Pa.Code § 15.2(1)(ii). Consequently, the [c]ourt correctly ruled that the tow truck operated by Mr. Gladu was "authorized" to use the turnaround in the median strip in furtherance of his road service efforts.

Contrary to [Mr. Keffer's] repeated assertions in his Amended 1925(b) State-

ment, the [c]ourt never ruled that the *manner* in which Mr. Gladu made his turn was appropriate. The [c]ourt left it for the jury to decide whether Mr. Gladu "executed" his turn "in a reasonable and safe manner," and whether Mr. Gladu took "every precaution ... [to] insure the safety of all motorists and pedestrians" as he made his turn as required by 67 Pa.Code § 15.3(a).

Judge Lachman Opinion, filed 6/6/12, at 10 (emphasis in original). Judge Lachman rejected Mr. Keffer's claim that public service acts may be provided only by governmental entities and not by for-profit, commercial enterprises and noted that it was undisputed that Mr. Gladu was " 'performing the type of work which is the basis of the vehicle's designation as an authorized vehicle in § 15.2 (relating to types of authorized vehicles).' 67 Pa.Code § 15.3(a)." *Id.* at 23–24. Indeed, Mr. Keffer's argument that tow truck operators may disregard rules of the road only when the vehicle is found to have been used "in the performance of public service" dictates an analysis of what constitutes "public service" is to be done on a case by case basis. A reading of the statute, though, suggests the designation of "authorized vehicle" by DOT is made after it has made a finding the vehicle is to be used to perform a public service, i.e., DOT decided tow trucks are used in performance of public service then included them in the regulations as "authorized vehicles."

Upon our review of the record and relevant statutory language, we find that the only issue Judge Lachman decided as a matter of law was the designation of the vehicle as an "authorized" one under the aforementioned statutes and regulations governing the use of the median opening. Indeed, Judge Lachman indicated on the record that in granting Defendants' motion

*in limine,* she was deciding an issue of law:

> [Ms. Gallagher]: So are you going to be instructing them that there's a specific judicial notice of authorization to make that turn?
>
> [Judge Lachman]: First of all, it is not judicial notice.... It is an issue of law.
>
> [Ms. Gallagher]: I thought their Motion was a Motion to take judicial notice.
>
> [Judge Lachman]: Well, they are wrong. It is not a judicial notice. It is for facts. This is a question of whether the tow truck was an authorized vehicle. That is an issue of the statute and the regs and the one case that was submitted which isn't on point.
>
> And having said all that, the [c]ourt has made a ruling of law.

N.T., 5/31/11 at 19–20.

Furthermore, at the conclusion of trial, Judge Lachman instructed the jury on this issue as follows:

> I am instructing you, ladies and gentlemen, that 15.2 includes tow trucks as authorized vehicles. Specifically, they are Type I authorized vehicles.
>
> Authorized vehicles such as tow trucks may utilize special median openings or divided highways designated for emergency and authorized vehicles **if every precaution is taken to insure the safety of all motorists and pedestrians.** Type II authorized vehicles may drive on highways or any part thereof closed to the general public when they are performing the type of work which is the basis of the designation of the vehicle as an authorized vehicle in 15.2 if the driving can be done in a reasonable and safe manner.
>
> This regulation or set of rules dictate the duty of care required of someone in the same situation as defendant Bob Nolan's Auto Services' tow truck driver defendant James Gladu. If you find that there was a violation of this Act, you will find that the defendant was negligent as a matter of law....
>
> Furthermore, the Act of the General Assembly of the Commonwealth of Pennsylvania in effect at the time of this accident provided, in part, any person who drives a vehicle in careless disregard for the safety of persons or property is guilty of careless driving, a summary offense. **This Act dictates the duty of care required by the defendants in this case and if you find a violation of this Act, you may find the defendants guilty of negligence as a matter of law....**

N.T., 6/16/11 at 103–104 (emphasis added). As such, we agree with Judge Lachman's finding that under the circumstances presented herein, Mr. Gladu's tow truck was an "authorized vehicle" and adopt her well-reasoned analysis in support of that finding. *See* Judge Lachman Opinion, filed 6/6/12, at 5–31.

▇▇▇ Mr. Keffer also maintains Judge Lachman's finding that the tow truck was an "authorized vehicle" violated the coordinate jurisdiction rule in light of the fact that Judge Overton had previously decided this issue when denying Bob Nolan's and Mr. Gladu's Motion for Partial Summary Judgment on the issue of punitive damages. Brief for Appellant at 15–17. Mr. Keffer disagrees with Judge Lachman's finding that the issue has been waived and argues that he "has not brought a new theory of liability in arguing the [t]rial [c]ourt has violated the Coordinate Jurisdiction Rule and [he] clearly set forth this position in detail in his motion for post-trial relief." Mr. Keffer's Brief at 16. Upon our review of the record, we find this issue has been waived.

Generally, the coordinate jurisdiction rule commands that upon transfer of a matter between trial judges of coordinate jurisdiction, a transferee trial judge may not alter resolution of a legal question previously decided by a transferor trial judge. *Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326, 1331 (1995); *see also Riccio v. American Republic Insurance Co.*, 550 Pa. 254, 705 A.2d 422, 425 (1997). More simply stated, judges of coordinate jurisdiction should not overrule each other's decisions. *Id.*; *Okkerse v. Howe*, 521 Pa. 509, 556 A.2d 827, 831 (1989).

The reason for this respect for an equal tribunal's decision, as explained by our court, is that the coordinate jurisdiction rule is "based on a policy of fostering the finality of pre-trial applications in an effort to maintain judicial economy and efficiency." *Starr*, 664 A.2d at 1331. Furthermore, consistent with the law of the case doctrine, the coordinate jurisdiction rule serves to protect the expectations of the parties, to insure uniformity of decisions, to maintain consistency in proceedings, to effectuate the administration of justice, and to bring finality to the litigation. *Id.*

*Zane v. Friends Hosp.*, 575 Pa. 236, 836 A.2d 25, 29 (2003) (footnote omitted).

■ Herein, Mr. Keffer raised the coordinate jurisdiction issue for the first time in his post-trial motion, though he filed a written opposition to the Appellees' motion *in limine*, as well as his own motion *in limine* and a motion for consideration. One "may not, at the post-trial motion stage, raise a new theory which was not raised during trial." *Solomon v. Presbyterian University Hospital*, 365 Pa.Super. 447, 530 A.2d 95, 97 (1987).

■ Nevertheless, even if Mr. Keffer had properly preserved this claim for our review, we note that this Court has determined:

In deciding whether to apply the coordinate jurisdiction rule, the Court must look to where the rulings occurred in the context of the procedural posture of the case rather than to whether an opinion was issued in support of the initial ruling.

Where the motions differ in kind, as preliminary objections differ from motions for judgment on the pleadings, which differ from motions for summary judgment, a judge ruling on a later motion is not precluded from granting relief although another judge has denied an earlier motion. However, a later motion should not be entertained or granted when a motion of the same kind has previously been denied, unless intervening changes in the facts or the law clearly warrant a new look at the question.

\*   \*   \*

[A] court involved in the later phases of a litigated matter should not reopen questions decided by another judge of the same court or by a higher court in the earlier phases of the matter. Among the related but distinct rules which make up the law of the case doctrine are that: ... upon transfer of a matter between trial judges of coordinate jurisdiction, the transferee trial court may not alter the resolution of a legal question previously decided by the transferor trial court."

*Martin Stone Quarries, Inc. v. Robert M. Koffel Builders*, 786 A.2d 998, 1001–1002 (Pa.Super.2001) (quotation marks and citations omitted). Therein, this Court found that the issues involved were essentially the same in that the first order had denied the appellees' motion for summary judgment based on the timeliness and apportionment requirements of the Mechanics' Lien Law, and the trial court subsequently

entered final judgment for the appellees because it found that the appellant did not abide by these two requirements such that "[e]ssentially, the trial judge overruled the exact same determination of the prior judge." *Id.* at 1001. Nevertheless, we ultimately held that the coordinate jurisdiction rule did not bar the trial judge from ruling in contradiction of the motion judge where the second decision was correct, although made after trial rather than during post-trial motions. *Id.* at 1002.

Herein, Judge Overton entered his order denying Appellees' Motion for Partial Summary Judgment without an accompanying opinion.[5] However, in their motion Appellees argued their conduct at the time of the accident did not warrant the imposition of punitive damages. As such, Judge Overton was not deciding the issue of what constitutes an "authorized vehicle" when ruling on the motion, nor did he set forth his specific reasoning in support of his ruling. For all of the foregoing reasons, Mr. Keffer's first clam fails.

▆▆▆ Mr. Keffer next argues that Judge Lachman erred in granting a nonsuit in favor of Bob Nolan's on the issue of negligent supervision and training. Specifically, in his brief Mr. Keffer maintains Judge Lachman "erred by requiring a standard beyond reasonable care for claims against Bob Nolan's for negligent supervision and lack of training, obstructing [Mr. Keffer]'s cross-examination of Bob Nolan's witnesses, thereby prejudicing [Mr. Keffer]'s ability to prove the claims in question and then finding that [Mr. Keffer] had not established sufficient facts to require the submission of his case to the jury." Brief for Mr. Keffer at 27.

[T]he trial court, on the oral motion of a party, may enter a nonsuit if the plaintiff has failed to establish a right to relief. Pa.R.C.P., Rule 230.1, 42 Pa. C.S.A. In evaluating the trial court's grant of a nonsuit, "we must view the evidence adduced on behalf of the [plaintiff] as true, reading it in the light most favorable to [her]; giving [her] the benefit of every reasonable inference that a jury might derive from the evidence and resolving all doubts, if any, in [her] favor." *Sinclair by Sinclair v. Block,* 534 Pa. 563, 568, 633 A.2d 1137, 1139 (1993). *Accord Taliferro v. Johns–Manville Corp.,* 421 Pa.Super. 204, 208, 617 A.2d 796, 799 (1992). Additionally, a compulsory nonsuit may be entered only in cases where it is clear that the plaintiff has not established a cause of action. . . . When so viewed, a non-suit is properly entered if the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action. . . . *Taliferro v. Johns–Manville Corp.,* 421 Pa.Super. at 208, 617 A.2d at 799. With respect to the trial court's evidentiary rulings, "[q]uestions concerning the admission and exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. The basic requisite for the admissibility of any evidence in a case is that it be competent and relevant." *Moran v. G. & W.H. Corson, Inc.,* 402 Pa.Super. 101, 125, 586 A.2d 416, 428 (1991), *allocatur denied,* 529 Pa. 650, 602 A.2d 860 (1992).

*Liles v. Balmer,* 439 Pa.Super. 238, 653 A.2d 1237, 1241 (1994), *appeal denied,* 541 Pa. 640, 663 A.2d 692 (1995). In addition, citing to our Supreme Court's holding in

---

**5.** Judge Overton's Order, filed on February 9, 2011, reads as follows: AND NOW, this *7th* day of *February*, 2011, upon consideration of [Appellees'] [ ] Gladu and Bob Nolan's [ ] Motion for Summary Judgment, and [Mr. Mr. Keffer's] response thereto, it is hereby **ORDERED** and **DECREED** that [Appellees'] Motion is **DENIED.**

*Harnish v. School Dist. of Philadelphia,* 557 Pa. 160, 163–64, 732 A.2d 596, 599 (1999) wherein the Supreme Court reiterated language from its earlier decision in *Atlantic Richfield Co. v. Razumic,* 480 Pa. 366, 390 A.2d 736 (1978), this Court reasoned as follows:

> A motion for compulsory nonsuit allows a defendant to test the sufficiency of a plaintiff's evidence.... To assure that the trial court considers the motion only on the basis of evidence favorable to the plaintiff, the [Rule 230.1] expressly limits the court's authority to grant a nonsuit to those instances where a defendant has "offered no evidence." Our cases have strictly enforced the terms of [Rule 230.1], prohibiting the trial court from granting the motion where the defendant offers evidence either during the plaintiff's case ... or after it.... We have even held that where the defendant exceeds proper bounds of cross-examination so as to elicit matters constituting a defense to the cause of action, the trial court is without authority to enter a nonsuit....

*Deiley v. Queen City Business Center Associates,* 757 A.2d 956, 957–958 (Pa.Super.2000).

At the close of Mr. Keffer's case in chief, Appellees presented a written Motion for Nonsuit wherein they requested that Judge Lachman dismiss the following claims for direct negligence which Mr. Keffer had brought against Bob Nolan's:

> 25 (i) negligently entrusting [Bob Nolan's] driver to a careless driver who ignored the clearly marked signs and rules of the road;

>        *      *      *

> (j) in negligently hiring, training, screening, evaluating, monitoring, supervising, and retaining [ ][Mr.] Gladu or doing so in an inadequate manner;

> (r) failing to instruct operators of tow trucks on safety precautions.

Amended Complaint of Mr. Keffer, at ¶ 25.

At the outset, we note that as the jury found Mr. Gladu was not negligent in his operation of the tow truck, it follows it could not have found Bob Nolan's liable for its failure to supervise and train him. Nevertheless, we find that Judge Lachman properly disposed of this issue in her Opinion and we rely upon and incorporate the arguments she makes on pages 46–53 of it in disposing of issue. *See* Judge Lachman Opinion, filed 6/6/12 at 46–53.

In his third issue, Mr. Keffer maintains that the trial court should have granted his request for a directed verdict in light of Bob Nolan's and Mr. Gladu's admissions on the record and the latter's "clear failure to ensure the safety of all motorists."

"A directed verdict may be granted only where the facts are clear and there is no room for doubt. In deciding whether to grant a motion for a directed verdict, the trial court must consider the facts in the light most favorable to the nonmoving party and must accept as true all evidence which supports that party's contention and reject all adverse testimony." *Maverick Steel Co., L.L.C. v. Dick Corporation/Barton Malow,* 54 A.3d 352, 356 (Pa.Super.2012) (citations and quotations omitted), reargument denied (Oct. 25, 2012).

In his brief, Mr. Keffer devotes just six sentences of argument to this claim and asserts that Mr. Gladu admitted he did not look for Mr. Keffer's van before he made the U-turn. Mr. Keffer reasons that if Mr. Gladu had done so he could have avoided the accident. Mr. Keffer also notes that Mr. Gladu admitted on the record he failed to reach the AAA member in a safe manner and concludes that "[i]t is beyond dispute that Mr. Gladu simply

failed to 'take every precaution to insure the safety of all motorists,' including [Mr. Keffer]." Brief for Mr. Keffer at 28.

At trial, Mr. Gladu testified as on cross that prior to making the U-turn, he utilized his truck's mirrors and observed Mr. Keffer's van about one and one half miles behind him. Mr. Gladu decided there was ample space between Mr. Keffer and him such that the former could utilize the turnaround to reach the stranded motorist. Mr. Gladu explained he looked around him to ensure "everything was safe" and that his lights were flashing. N.T., 6/6/11 at 96–98, N.T., 6/7/37 at 37. He also explained he had accessed the turnarounds on I–95 "numerous" times, and "would have aborted if it wasn't safe." N.T., 6/7/11 at 34. In addition, Mr. Gladu further testified that when he spotted the stranded vehicle he proceeded to "look all around" him, began pumping his brakes and slowing down with his turn signal on prior to making the U-turn. N.T., 6/6/11 at 104.

As Judge Lachman correctly notes in her Opinion:

> [it] was the duty of the jury to decide whether the collision occurred in the left land or in the center lane, whether Mr. Gladu's observation of the van before the collision was sufficient and whether he took 'every precaution' to make the turn safely. . . . The record contains sufficient evidence to support the jury's verdict that Mr. Gladu was not negligent in the manner in which he made the [U]-turn. . . . Whether Mr. Gladu took every precaution when making his turn was a question of fact for the jury to determine based on all of the circumstances surrounding the turn.

Judge Lachman's Opinion, filed 6/6/12, at 57–58.

Upon our review of the record, we find Judge Lachman did not err in denying Mr. Keffer's motion for a directed verdict.

■ Mr. Keffer next claims Judge Lachman erred in allowing Mr. Stephen Fenton, Appellees' accident reconstruction expert, to testify at trial in light of the fact that Appellees had agreed the underlying data upon which his conclusions were based would not be offered into evidence and that he had submitted an untimely, supplemental report which introduced a new theory and was not based upon any calculations.

■ At the outset we recognize that our standard of review regarding this claim is very narrow.

> The admission or exclusion of evidence, including the admission of testimony from an expert witness, is within the sound discretion of the trial court. . . . [W]e may only reverse upon a showing that the trial court clearly abused its discretion or committed an error of law. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*McClain ex rel. Thomas v. Welker*, 761 A.2d 155, 156 (Pa.Super.2000), appeal denied, 565 Pa. 647, 771 A.2d 1286 (2001).

Appellants also contend that Mr. Fenton's expert testimony was not based upon evidence of record. We note that our standard of review for evidentiary rulings is also a narrow one:

> When we review a trial court's ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it

must have been harmful or prejudicial to the complaining party.

*Reott v. Asia Trend, Inc.*, 7 A.3d 830, 839 (Pa.Super.2010). The admissibility of expert testimony is soundly committed to the discretion of the trial court, and the trial court's decision will not be overruled absent "a clear abuse of discretion." *Helpin v. Trustees of Univ. of Pennsylvania*, 969 A.2d 601, 617 (Pa.Super.2009), *aff'd*, 608 Pa. 45, 10 A.3d 267 (2010), *see also Hatwood v. Hospital of University of Pennsylvania*, 55 A.3d 1229, 1239 (Pa.Super.2012).

Pa.R.E. 702 provides that a party may present the testimony of an expert:

> If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Pa.R.E. 702.

Mr. Fenton submitted three reports in this case, one dated December 23, 2010, another dated February 9, 2011, and the last dated June 3, 2011, which he prepared after receiving a supplemental report dated May 20, 2011, from Steven Marc Schorr, P.E., Mr. Keffer's accident reconstruction expert, wherein Mr. Schorr found fault with Mr. Fenton's earlier reports. In his brief, Mr. Keffer argues that Mr. Fenton's expert opinion was based upon an unreliable methodology, PC–Crash analysis, and was inconsistent with his opinions as to the property damage. Brief for Mr. Keffer at 28. Mr. Keffer further asserts Judge Lachman erred by failing to rule on his Motion to strike Mr. Fenton's testimony after he had admitted to the jury his "Dip in the Median" theory was not based upon any specific calculations because such calculations "were too complicated." *Id.* at

29. Lastly, Mr. Keffer maintains Judge Lachman should not have allowed Mr. Fenton to testify as to the findings he made in his allegedly untimely June 3, 2011, supplemental report. *Id.* at 32.

Once again, upon our review of the record, we find Judge Lachman properly and correctly addresses these issues in her Opinion, and adopt her reasoning herein as our own. *See* Judge Lachman Opinion, filed 6/6/12, at 34–44.

■ In his next argument, Mr. Keffer asserts the trial court erred in allowing Trooper Kevin Martin, a Pennsylvania State Police Officer who responded to the accident, to testify regarding his observation of the scene and investigation of the accident. Mr. Keffer maintains that in granting a motion filed by Appellees to exclude Trooper Martin from expressing his opinion as to how the accident occurred, Judge Lachman noted he could not be offered as an expert, and as such, his testimony would have to be based upon only his actual perceptions made at the accident scene. Mr. Keffer reasons that because Trooper Martin did not witness the accident, he could not opine about causation. Mr. Keffer further asserts that a line of questioning on cross-examination regarding a diagram in the police report "allowed [Appellees]' counsel to portray to the jury that Trooper Martin placed both units in the left lane at the time of the impact, which was in complete contradiction of the [c]ourt's earlier ruling that Trooper Martin could not testify about the impact because he did not observe it." Brief for Mr. Keffer at 34–35.

Specifically, Mr. Keffer posits that "the following questions and responses elicited the very issues [Appellees] successfully precluded via their Motion *in Limine*." Brief for Mr. Keffer at 34.

**Q:** And would you agree with me, Trooper, that the diagram on the official state police investigation report shows the two units involved in this accident, am I right?

**Mr. Turchi:** I make an objection, Your Honor, at this point. This is going into what I believe what we already discussed this morning and outside the scope. This is based upon investigation.

**Mr. Kuzmick:** Your Honor, I'm only asking the trooper to identify the units on the diagram.

**Mr. Turchi:** And I believe Your Honor discussed that this morning saying that when and where Trooper Martin arrived.

The Court: Overruled.

**Q:** All right. Trooper, and it's just fair for all [of] us to understand, Units 1 and 2. We know that you know it. Unit 1, that is the tow truck; correct?

**A:** Correct

**Q.** Unit 2 is Mr. Keffer's van; correct?

**A.** Correct.

**Q.** All right. And as drawn on the diagram they're both in the left lane; correct?

**A.** Correct.

*   *   *

**Q.** Trooper, the diagram prepared by Trooper Nyitray which you looked at before your testimony here today has the point of impact on the roadway in the left lane; is that a fair statement?

**Mr. Turchi:** Objection, Your Honor, That's outside. That was discussed this morning.

**Mr. Kuzmick:** Just about the diagram, Your Honor.

**Mr. Turchi:** His diagram is based upon an investigation. The Court: To the

extent it is what he observed, it is admissible.

*   *   *

**Q:** The debris was located where you have your impact?

**A:** yes.

**Mr. Turchi:** Objection, Your Honor. Again, this is what we discussed this morning and was not to be discussed now. This is part of that Motion and request to keep out. This is based upon observations only of Trooper Martin.

**The Court:** And observations are admissible.

**Mr. Turchi:** Correct. Observed by him upon arrival.

**Mr. Kuzmick:** And I'm asking him about the debris which he said he saw.

**The Court:** All right. Overruled.

**Mr. Turchi:** You Honor, its observation of an impact. Trooper Martin did not observe the impact.

**The Court:** Overruled, Counselor.

Brief for Mr. Keffer at 34–36, *citing N.T.,* 6/1/11 at 22–24, 33–34, 36.

Mr. Keffer maintains the first line of questioning suggested to the jury that Trooper Martin placed both vehicles in the left lane at the time of impact, while the second and third permitted Trooper Martin "to place the point of impact in the left lane" though he did not observe the impact. Brief for Mr. Keffer at 35–36. However, upon our review of Trooper Martin's direct examination testimony, we find it had been based upon his observation of the accident scene and the accident report that he prepared along with another officer. The aforementioned excerpts reveal that Trooper Martin did not opine as to the cause or place of impact of the accident, but rather commented upon images he viewed in the diagram which were based upon his personal observations of the accident site. Indeed, as Judge Lach-

man states in her Opinion, the testimony at issue is "merely a continuation of the same subject matter originally brought out by [Mr. Keffer] during his direct examination of Trooper Martin." Judge Lachman Opinion, filed June 6, 2012 at 66.

On Direct Examination, Trooper Martin explained he had taken some of the measurements indicated on the diagram and that the report was based upon his observations of the accident scene and interview of Mr. Gladu. N.T., 5/31/11 at 65–72. In the first excerpt Mr. Keffer cites, Trooper Martin simply was asked whether he agreed that Unit 1 on the diagram represented the tow truck, Unit 2 represented Mr. Keffer's van and that they are both depicted in the left lane on the diagram. In the next two question/answer sequences, Trooper Martin indicates that Trooper Nyitray has the point of impact on the diagram in the left lane, and that the debris at the scene was located where the impact had been indicated on the diagram. Such queries require Trooper Martin to comment upon the location of objects in a diagram which depicts debris in an accident scene he observed personally. Indeed, when he was asked to opine as to "how the accident happened," Judge Lachman sustained the objection after hearing counsel's argument that "[t]his is not a witness who has been qualified as an expert. He's being called as a fact witness who conducted a response to an accident scene. N.T., 5/31/11 at 74. Therefore, this claim merits no relief.

■ Mr. Keffer's final two issues pertain to Judge Overton's granting of AAA's motion for summary judgment. Specifically, Mr. Keffer argues the trial court erred in holding AAA could not be held vicariously liable for his injuries and in dismissing all claims concerning direct negligence in light of evidence which raised a question of AAA's direct liability.

Our well-settled standard of review of a challenge to an order granting summary judgment is as follows:

We may reverse if there has been an error of law or an abuse of discretion. Our standard of review is de novo, and our scope plenary. We must view the record in the light most favorable to the nonmoving party and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Furthermore, [in] evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. See Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the nonmoving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law.

*Gubbiotti v. Santey*, 52 A.3d 272, 273 (Pa.Super.2012) (citations omitted).

Mr. Keffer contends Judge Overton erroneously decided questions of fact in determining Bob Nolan was an independent contractor, not an employee, of AAA. Mr. Keffer's Brief at 37. Mr. Keffer reasons that though AAA's contract contains boilerplate language labeling its relationship with Bob Nolan's as independent, "the actual performance under the contract belies this label." *Id.* at 39–40. In this regard, Mr. Keffer states that "[i]n the end, the seminal question here was whether Mr. Gladu controlled both the manner and method by which he delivered service to

AAA customers, and on this issue, the record evidence showed that this was just not the case." Mr. Keffer's Brief at 39–40, 43.[6]

Mr. Keffer bases his first argument upon a theory of vicarious liability. In *Mamalis v. Atlas Van Lines, Inc.*, 522 Pa. 214, 560 A.2d 1380, 1383 (1989), our Pennsylvania Supreme Court explained this theory of recovery as follows:

> The rules of vicarious liability respond to a specific need in the law of torts: how to fully compensate an injury caused by the act of a single tortfeasor. Upon a showing of agency, vicarious liability increases the likelihood that an injury will be compensated, by providing two funds from which a plaintiff may recover. If the ultimately responsible agent is unavailable or lacks the ability to pay, the innocent victim has recourse against the principal. If the agent is available or has means to pay, invocation of the doctrine is unnecessary because the injured party has a fund from which to recover.

In support of his decision that AAA cannot be held vicariously liable because Bob Nolan's was an independent contractor, Judge Overton stated that:

> In this instance, the contract between AAA [ ] and Bob Nolan's [ ] specifically defined their relationship as that of an "independent contractor." Moreover, Bob Nolan's [ ] hired its own employees, supplied its own equipment and managed its own operation. Additionally, Bob Nolan's contract was nonexclusive with AAA [ ] and other companies took on repair jobs for the same regional area. Finally, Bob Nolan's [ ] was paid by the task completed and not by an hourly or set rate by AAA [ ]. Therefore,

AAA cannot be held vicariously liable for the actions of Bob Nolan's [ ] or [Mr.] Gladu because its relationship with both was that of an independent contractor.

Judge Overton's Opinion, filed 1/27/12 at 3. Upon our review of the record, we agree.

The initial provision of the Roadside Assistance Service Provider Agreement Contract Number (3415) defines AAA as "a Pennsylvania not-for-profit Corporation," and Bob Nolan's as "an independent Roadside Assistance contract facility." In the body of the contract between AAA and Bob Nolan's, their relationship is described as follows:

> It is understood and agreed that CONTRACTOR is not acting as an employee or agent of [AAA] but as an INDEPENDENT CONTRACTOR, nor is [AAA] acting as agent for CONTRACTOR. It is further understood and agreed that [AAA] shall not have nor shall it exercise any right of control as to the manner, methods or means employed by CONTRACTOR in the rendering of services herein provided. CONTRACTOR acts in an independent capacity as a public garage and is exclusively responsible for its actions in connection with the rendering of services under this Contract. CONTRACTOR shall have no power or authority other than herein expressly granted and shall nave no authority to act on behalf of [AAA] or extend, waive or change any of [AAA's] membership terms, condition, and benefits.

Roadside Assistance Service Provider Agreement Contract Number (3415) at § VIII. In addition, Sections IX and X of

---

**6.** Later in his Brief, Mr. Keffer repeatedly refers to the way in which AAA related to its "contractors." Mr. Keffer's Brief at 47.

the Contract indicated that Bob Nolan's would defend and indemnify AAA for any and all claims, including punitive damages, court costs and attorney's fees, "arising out of the performance by contractor, its employees or agents or any services under this Contract," and maintain at its own expense its own liability insurance. Roadside Assistance Service Provider Agreement Contract Number (3415) at §§ IX and X.

■ Even were we to accept as true Mr. Keffer's claims that Bob Nolan's was an employee of AAA, "[i]t is clear that if [an] employee was found to not have been negligent, that [his employer] could not be held negligent under the doctrine of respondeat superior." *Skalos v. Higgins,* 303 Pa.Super. 107, 449 A.2d 601, 607 (1982). Therefore, even had the trial court erred in granting AAA's motion for summary judgment, AAA could not have been held liable for Mr. Keffer's injuries under a vicarious liability theory, as Mr. Gladu was found not to have been negligent. Indeed, the trial court specifically instructed the jury that an employer is liable for the negligence of its employee occurring in the course and within the scope of his employment and that if it found Mr. Gladu to be liable, it must also find Bob Nolan's liable. To the contrary, the trial court explained that if Mr. Gladu were found not liable, then Bob Nolan's also would not be liable. N.T., 6/16/11 at 106.

■ Mr. Keffer also asserts the trial court erred in granting AAA's summary judgment motion because AAA was liable under a theory of direct negligence. Mr. Keffer maintains the evidence reveals a "genuine dispute of material fact as to whether AAA's own actions were a proximate cause of the accident." Mr. Keffer's Brief at 44.

Our Supreme Court has set forth the elements of a cause of action based upon a negligence theory in Pennsylvania as follows:

(1) a duty or obligation recognized by the law requiring the defendant to conform to a certain standard of conduct for the protection of others against unreasonable risks;

(2) defendant's failure to conform to the standard required;

(3) a causal connection between the conduct and the resulting injury;

(4) actual loss or damage resulting to the plaintiff.

*R.W. v. Manzek,* 585 Pa. 335, 888 A.2d 740, 746–748 (2005) (citations omitted).

In his Opinion, Judge Overton briefly explains his decision that Mr. Keffer's claim of direct negligence failed because there is no evidence to support a finding that AAA's Priority Call Policy caused the accident as follows:

[Mr. Keffer's] other claim of negligence against AAA Mid–Atlantic Inc. is also without merit. In order to submit a negligence claim to a jury, the plaintiff must proffer sufficient evidence of record from which the jury could reasonably conclude that the defendant's actions causally created the accident. *Farnese v. Septa* [338 Pa.Super. 130], 487 A.2d 887 (Pa.Super.Ct.1985). In this instance, [Mr. Keffer] alleged that AAA Mid–Atlantic's policies caused the accident but provides no factual evidence of any causal connection between the Priority Call Policy of AAA Mid–Atlantic and the accident. [Mr. Keffer's] argument alleging that AAA Mid–Atlantic had a priority call policy incentivizing response time caused the accident is unsupportable. Therefore, summary judgment was properly entered in favor of AAA Mid–Atlantic Inc.

Judge Overton's Opinion, filed 1/27/12 at 3–4. Upon our review of the record, we

agree. Moreover, even if Judge Overton erred in this determination, Mr. Keffer's claim fails in light of the fact that he cannot prove the third element of the negligence test because the jury found Mr. Gladu was not negligent.[7]

Orders affirmed.

### Attachment

8. The Court abused its discretion "in restricting Plaintiff's cross examination of Defendants, their witnesses, and Brian DuBree thereby thwarting Plaintiff's ability to prove his case." Plaintiff's Amended 1925(b) Statement ¶ 12.

9. The Court abused its discretion in barring Plaintiff from introducing evidence as to Defendant Gladu's violations of the motor vehicle code. Plaintiff's Amended 1925(b) Statement ¶ 13.

None of these issues has merit. The Superior Court should affirm the judgment entered on the jury's verdict for Defendants Bob Nolan's Auto Service, Inc., and James Gladu.

### *DISCUSSION*

### 1. THE FLATBED TOW TRUCK WAS AN "AUTHORIZED VEHICLE"

Prior to trial, Plaintiff filed a motion *in limine* at Control No. 11051354, to Preclude All Defendants from Offering any Evidence, Opinion or Making Any Reference, Suggestion and/or Innuendo that James Gladu's U-turn was Legal or Permissible Under the Pennsylvania Motor Vehicle Code. The Defendants filed a motion *in limine* at Control No. 11051360, for the Court to Take Judicial Notice that the Tow Truck Was an "Authorized" Vehicle and Permitted to Use the Median Opening.

Both of these motions turned on the same basic question: Was the tow truck operated by Defendant Gladu an "authorized vehicle" permitted to use the turnaround in the median for a u-turn? The Court's ruling that Defendant Gladu's tow truck *was* an "authorized vehicle" was based on (1) the plain language of the statutes and regulations at issue, (2) the rules of statutory construction, arid (3) Plaintiff's admissions that, at the time Defendant Gladu attempted to use the turnaround in the median, he was on his way to assist a stranded motorist and, therefore, was going to use the turnaround in the capacity of a roadside-service vehicle or highway service vehicle.

The Court granted the Defendants' motion *in limine* and denied the Plaintiff's motion *in limine* in orders dated May 31, 2011. The Court incorporates by reference its detailed ruling explaining those decisions at N.T. 5/31/11 AM, pp. 10–20. Plaintiff filed a motion for reconsideration of those decisions at Control No. 11060119. The Court denied that motion in an Order dated June 3, 2011. The Court incorporates by reference its very detailed explanation for denying reconsideration at N.T. 6/3/11 PM, pp. 73–89.

The Court will first discuss the applicable statutes and regulations, the general basis for the Court's decision, and the evidence the Plaintiff presented in opposition to the Defendants' motion *in limine*. The Court will then address the specific reasons Plaintiff contends the Court's rulings were incorrect as identified in Plaintiff's Amended Pa.R.A.P. 1925(b) Statement.

---

7. We "may affirm the decision of the trial court if there is any basis on the record to support the trial court's action; this is so even if we rely on a different basis in our decision to affirm." *Commonwealth v. O'Drain*, 829 A.2d 316, 321 n. 7 (Pa.Super.2003).

**A. _The statutes and regulations at issue_**

The Pennsylvania Motor Vehicle Code defines "authorized vehicle" as follows:

> "AUTHORIZED VEHICLE" A vehicle or type of vehicle, other than an emergency vehicle, for which special operating or equipment privileges are given by law or regulation of the department based on design and utility for work within a highway.

75 Pa.C.S. § 102.

"Chapter 33 of the Vehicle Code, 75 Pa.C.S. §§ 3301–3368, provides for 'Rules of the Road in General.' Section 6107, 75 Pa.C.S. § 6107, empowers the Department of Transportation (DOT) to designate certain vehicles or types [of vehicles] as authorized vehicles upon a finding that the vehicle is used in the performance of public service or governmental functions and to exempt such vehicles from certain provisions of the Vehicle Code as specified in DOT regulations." _Sawczuk–Serge v. Township of Cheltenham,_ 670 A.2d 210, 212 (Pa.Cmwlth.1996). Section 6107 states:

> § 6107. Designation of authorized vehicles by department
>
> The department may designate any vehicle or group of vehicles as authorized vehicles upon a finding that the vehicle is used in the performance of public service or governmental functions. Duly authorized vehicles shall be exempted from certain provisions of this title as specified in regulations promulgated by the department.

75 Pa.C.S. § 6107 (emphasis added). The regulations issued by DOT under Section 6107 are found at 67 Pa.Code §§ 15.1–15.3. _Sawczuk–Serge,_ 670 A.2d at 212. Section § 15.1 states:

> § 15.1. Purpose

This chapter establishes the types of vehicles which are considered authorized vehicles under, 75 Pa.C.S. §§ 102, 4572(b) and 6107 (relating to definitions; visual signals on authorized vehicles; and designation of authorized vehicles by Department) and establishes special operating privileges for authorized vehicles.

67 Pa.Code § 15.1.

Seven types of authorized vehicles are enumerated in 67 Pa.Code § 15.2. _Sawczuk–Serge,_ 670 A.2d at 212. Tow trucks are specifically included among the "Type I" "authorized vehicles" in § 15.2(1)(iii):

> § 15.2. Types of authorized vehicles
>
> The vehicles enumerated in this section arc designated as authorized vehicles of the type indicated. They may be equipped with one or two flashing or revolving yellow lights as provided in 75 Pa.C.S. § 4572(b) (relating to flashing or revolving yellow lights), and as defined in Chapter 173 (relating to flashing or revolving lights on emergency and authorized vehicles), except that school buses shall be equipped with red and amber flashing lights as defined in 75 Pa.C.S. § 4552 (relating to general requirements for school buses). The flashing or revolving yellow lights on all authorized vehicles except school buses shall be activated only when the vehicle is performing the type of work which is the basis of the designation of the vehicle as an authorized vehicle, except lights on Type VI vehicles may be activated whenever an emergency condition requires police assistance. The enumeration of vehicles is as follows:
>
> (1) _Type I._ Type I vehicles include the following:
>
> (i) Highway construction and maintenance vehicles. Such vehicles shall include, but not be limited to, traffic-line-painting trucks, sign and

signal maintenance trucks, dump trucks, street sweepers, mowers, highway inspection vehicles, and vehicles involved in traffic studies or investigations or right-of-way operations.

(ii) Vehicles which are used in utility operations.

(iii) Highway service vehicles such as, but not limited to, **tow trucks** and road-service vehicles.

67 Pa.Code § 15.2 (emphasis added). The special operating privileges given to these vehicles are enumerated in 67 Pa.Code § 15.3. *Sawczuk–Serge,* 670 A.2d at 212. Section 15.3 provides in part:

### § 15.3.  Special operating privileges

(a) *General.* The following types of authorized vehicles may exercise the special privileges indicated **when they are performing the type of work which is the basis of the vehicle's designation as an authorized vehicle in § 15.2** (relating to types of authorized vehicles) **and the special privileges can be executed in a reasonable and safe manner:**

(1) **Any type of authorized vehicle,** except Types Ill, VI and VII vehicles, **may utilize special median openings on divided highways designated for emergency and authorized vehicles, if every precaution is taken to insure the safety of all motorists and pedestrians.**

(2) Types I, II and IV authorized vehicles may drive on highways, or any part thereof, closed to the general public when they are performing the type of work which is the basis of the designation of the vehicle as an authorized vehi-

cle in § 15.2, if the driving can be done in a reasonable and safe manner.

67 Pa.Code § 15.3 (emphasis added).

The Court was required to give full force and effect to the clear and unambiguous language of 67 Pa.Code § 15.2(1)(iii) that a tow truck is a Type I "authorized vehicle." Therefore, the tow truck operated by Defendant Gladu was permitted to use the median opening on 1–95 to make a u-turn pursuant to 67 Pa.Code § 15.3, if it was acting as a highway service vehicle or road-service vehicle, because that is "the type of work which is the basis of the vehicle's designation as an authorized vehicle in § 15.2."

In paragraph 3(d) of his Amended 1925(b) Statement, Plaintiff argues that it was a factual question for the jury to decide whether Mr. Gladu was operating his tow truck as a highway service vehicle or road-service vehicle at the time he made his u-turn in the median opening. That Mr. Gladu was operating a tow truck that was being used as a highway or road-service vehicle when he made the u-turn was admitted by the Plaintiff. This issue is discussed in greater detail at pages 28–30, below. Plaintiff *did* dispute whether a tow truck operated by a for-profit company like Bob Nolan's was being "used in the performance of public service or governmental functions" within the meaning of 75 Pa.C.S. § 6107. That issue is discussed separately at pages 18–24, below.

Because Mr. Gladu was on his way to rescue a stranded motorist on 1–95 North, he was performing the highway service or road service mentioned in 67 Pa.Code § 15.2(1)(iii). Consequently, the Court correctly ruled that the tow truck operated by Mr. Gladu was "authorized" to use the turnaround in the median strip in furtherance of his road service efforts.

Contrary to the Plaintiff's repeated assertions in his Amended 1925(b) State-

ment, the Court never ruled that the *manner* in which Mr. Gladu made his turn was appropriate. The Court left it for the jury to decide whether Mr. Gladu "executed" his turn "in a reasonable and safe manner," and whether Mr. Gladu took "every precaution ... [to] insure the safety of all motorists and pedestrians" as he made his turn as required by 67 Pa.Code § 15.3(a). This issue is discussed at pages 28–32, below. Based on all of the evidence, the jury decided that Mr. Gladu's turn complied with these requirements and found that he was not negligent.

### B. *Plaintiff's evidence opposing Defendants' motion in limine*

In opposing the Defendants' motion *in limine*, Plaintiff repeatedly stated that because Defendant Gladu testified in his deposition that he did not know he was authorized to use the opening in the median, he was wrong to use it. Determining what a statute or regulation means "is a matter of law to be determined from the face of the statute or regulation itself. It does not depend on a particular defendant's motive or intent, what a particular defendant thought the rule or statute meant, or whether or not the defendant accurately

guessed what the draftsman had actually intended." *Commonwealth v. Stein,* 519 Pa. 137, 144–145, 546 A.2d 36, 40 (1988) (plurality).[2]

Plaintiff submitted the deposition testimony of State Trooper Derso Nyitray, Jr., for the proposition that Mr. Gladu could not use the turnaround in the median because going to the aid of a motorist with a flat tire is not an emergency. Trooper Nyitray, who was still undergoing training at the time of the accident, testified that "a flat tire isn't really an emergency because you can drive on your rim to safety." Nyitray Dep. p. 27. Trooper Nyitray's opinion is interesting, but absurd. Most drivers would think that getting a flat tire on Interstate 95 is a real emergency and that attempting to change the tire on their own would be fraught with danger. A flat tire on the side of an Interstate highway is precisely the reason motorists subscribe to a roadside service such as AAA. Very few people would think that the proper response to a flat tire was to drive on the rim, thereby wrecking not only the tire but also the wheel. Faced with a flat tire and fearful of changing the tire himself because of the danger of traffic on 1–95, a driver's rational response is to call AAA or

2. At trial, *Plaintiff's* attorney expressly asked Mr. Gladu whether he was "an emergency vehicle" and an "authorized vehicle" under Pennsylvania law. Mr. Gladu answered that he was both. N.T. 6/6/11 PM, pp. 77, 78. He testified that his tow truck was "an emergency service vehicle" and "it says it right on the side of the truck. Yes, I am, I'm doing AAA emergency services on the highway." *Id.,* p. 68.

> A. ... I just know that on the side of my truck and that we are contracted for AAA emergency services and I work on a highway, so I am an emergency services vehicle. That's what I do. I perform emergency services.
> Q. Okay. So let's talk about you're a roadside service; is that correct?

A. Yes, and on 95, a roadside service is an emergency service.

N.T. 6/6/11 P.M., p. 79. At trial, Mr. Gladu testified that he used the turnarounds on 1–95 "numerous" times. N.T. 6/7/11 PM, p. 34. He said that he could use the special operating privileges, such as the turnarounds and drive his truck in the left lane, only when he was actually engaged in roadside service. "I feel I fall under the category of an emergency service vehicle when I'm doing my work. Now, on—if I'm just driving down 95, am I going to go in that left-hand lane? No. If I'm performing my work with my lights on and doing what I do, yes. Yes, I am." N.T. 6/6/11 PM, p. 78. This trial testimony occurred, of course, after the Court ruled on the pretrial motions in limine.

some other roadside service for help, as did the stranded motorist in the present case.

Plaintiff also relied on the deposition testimony of State Trooper Kevin Martin who testified that a tow truck was not an "authorized vehicle" based on a definition from the *Pennsylvania Criminal Justice Handbook*. Dep. pp. 26–27. Trooper Martin testified that he was given the *Handbook* by the State Police, Dep. p. 42. The *Handbook* defines an "authorized vehicle" as follows:

**Authorized Vehicle**

A vehicle or type of vehicle, other than an emergency vehicle, for which special operating or equipment privileges are given by law or regulation of the Department based on design and utility for work within a highway. [Citing 75 Pa.C.S. § 3326 (duty of driver in construction and maintenance areas or on highway safety corridors), and 75 Pa.C.S. § 4572 (visual signals on authorized vehicles).]

With the exception of the material in brackets, this is a verbatim quotation of the definition of "authorized vehicle" set forth in § 102 of the Motor Vehicle Code, 75 Pa.C.S. § 102. There is nothing in this definition that excludes tow trucks from being "authorized vehicles." The Court rejected Trooper Martin's legal opinion because it contradicted the clear and unambiguous language of 67 Pa.Code § 15.2(1)(iii). Moreover, it was the function of the Court, not a witness or even an alleged expert witness, to divine the meaning of Pennsylvania statutes and regulations.

Plaintiff pointed to Trooper Martin's deposition testimony that to become listed as an authorized vehicle *for the State Police* certain forms must be filled out and submitted:

Q. Sir, how does one become **an authorized tow truck** *for the state police?*

A. I don't know all the specifics, but they have to apply. I don't know the form. That goes through our management, our station commander. They have to apply, though—fill out the proper paperwork. I believe that gets sent out to PennDOT or Harrisburg and they're told yes or no. They have to fit regulations. I know of some of those. They have to be able to tow like if a tractor trailer overturns, they have to have a heavy-duty tow, they have to have light duty tows. Some don't have that so **they're not picked by the state police.**

Q. Once a tow truck has been **authorized as a Pennsylvania State Police tow truck,** would that vehicle have been permitted to use that turnaround?

A. Yes.

Martin Dep. pp. 45–46 (emphasis added). This testimony had no probative value because Trooper Martin obviously did not have personal knowledge or a firm grasp of the specifics of the subject about which he was testifying. Plaintiff chose not to depose or present the "station commander" who Trooper Martin said oversaw the program. Plaintiff did not produce any of the forms or paperwork mentioned by Trooper Martin. Plaintiff did not identify the regulations to which Trooper Martin referred. Plaintiff chose not to depose or produce a witness from PennDOT to corroborate or explain the procedure alluded to by Trooper Martin.

Trooper Martin's testimony was entirely irrelevant to the issue of whether Bob Nolan's AAA-related tow truck was an "authorized vehicle," because Trooper Martin's testimony concerns *only* those tow trucks which are on the list of tow trucks the *State Police* will call to clear a

vehicle from the highway.[3] Plaintiff did not submit any statutory, regulatory, or other documentary evidence that *only* those tow trucks approved by the Pennsylvania State Police fall within the definition of "authorized vehicles" in 75 Pa.C.S. § 102, or within the meaning of "authorized vehicles" in 75 Pa.C.S. § 6107 or 67 Pa.Code §§ 15.1–15.3. Plaintiff did not submit any evidence that the hundreds of tow trucks operated by AAA and other roadside assistance companies in the Philadelphia area are also required to be approved by the State Police.

Plaintiff also relied on the deposition testimony of Trooper Nyitray to show that Gladu's tow truck was not "authorized" to make the u-turn.

> ... And then at that time me and my coach were telling him [Glade] you're not in an emergency vehicle and he's not—this is a little bit in the past and I really don't remember. I'm not sure if he's even—if he's in an authorized vehicle, **he's not really even authorized unless we tell him to go out, do the U-turn.** And I don't remember getting any dispatch saying there is an emergency on the highway, which at that time I would have been dispatched to the car with the flat tire and just provided traffic control until the tow truck arrived. That's what we would do.

Nyitray Dep. pp. 26–27 (emphasis added).

Trooper Nyitray was a rookie trooper and his "coach" was his training officer Trooper Martin. By no stretch of the imagination could Trooper Nyitray be considered an "expert witness." Furthermore, in his deposition he was referring to tow trucks that the State Police summon from their list of approved tow truck operators. Plaintiff did not present any evidence that the State Police must be contacted before an AAA-related tow truck may respond to a service call. Trooper Nyitray's opinion was not supported by any statutory or other documentary evidence.

Lastly, Plaintiff pointed to Section 9–605(2)(f) of Title 9 of the Philadelphia Code for the proposition that "not every tow truck on the road is deemed authorized." According to the Plaintiff,

> Title 9 of the Philadelphia Code regarding regulation of businesses, trades and professions specifically addresses a rotation system for tow trucks in the City of Philadelphia. § 9–603(2)(f) defines a rotation system as:
>
> > A method of selecting a tow truck from an authorized list for the purpose of towing a disabled vehicle from one point to another. Once an assignment is made, that vehicle rotates to the bottom of the list. The list will be controlled by the Philadelphia Parking Authority on a Divisional basis.

Page 18 of Plaintiff's Brief at Control No. 11051360. The Philadelphia Code is not relevant to any issue in this case. The legislature gave PennDOT, not the Philadelphia City Council, the authority to issue regulations governing "authorized vehicles."

Philadelphia's towing ordinance is aimed at the sometimes fraudulent or violent confrontations that occur as different towing companies compete to remove disabled cars from the highway. The fact that the ordinance is not aimed at the tow trucks sent by AAA or other services, after a

---

**3.** During trial, Mr. Gladu explained the difference between the limited roadside service he renders for AAA, and what tow trucks summoned by the police do following serious accidents. N.T. 6/6111 PM. pp. 79–80.

member calls for assistance, is made clear in the ordinance itself:

> (g) *Solicitation.* The act, at a vehicular accident scene, hospital, emergency care facilities, funeral homes or during the occurrence of police operations relating thereto, of seeking, persuading, enticing or in any way offering assistance of services relating to the towing of vehicles, **which services have not been requested by the person solicited.**

9 Phila. Code § 9–605(2)(g) (definitions) (emphasis added). Plaintiff did **not** argue that Gladu or Bob Nolan's Auto Service lacked the proper licenses under the Philadelphia Ordinance.[4]

## C. *The Coordinate Jurisdiction Rule issue is waived*

Plaintiff contends that by granting the Defendants' motion *in limine*, the Court disregarded and contradicted a previous ruling by Judge Overton denying the Defendants' motion for partial summary judgment seeking to strike the Plaintiff's claim for punitive damages. According to the Plaintiff, this was a violation of the coordinate jurisdiction rule requiring a new trial.

Plaintiff waived this issue because the first time this issue appeared was in Plaintiff's post-trial motion. Plaintiff did not raise the coordinate jurisdiction rule or judge Overton's decision in Plaintiff's written opposition to the Defendants' motion *in limine*, in Plaintiff's own motion *in limine*, in his motion for reconsideration, or in his argument on any of those motions.

" 'On appeal the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected. In this jurisdiction one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.' " *McManamon v. Washko,* 2006 PA Super 245, 906 A.2d 1259, 1274, *quoting Hong v. Pelagatti,* 2000 PA Super 373, 765 A.2d 1117, 1123.

A party "may not, at the post-trial motion stage, raise a new theory which was not raised during trial." *Solomon v. Presbyterian University Hospital,* 365 Pa.Super. 447, 451, 530 A.2d 95, 97 (1987). "A decision to pursue one argument over another carries the certain consequence of waiver for those arguments that could have been raised but were not." *Walsh v. Borczon,* 2005 PA Super 256, 881 A.2d 1, 6 (citation omitted).

Filing a motion *in limine* raising some specific issues waives later review of the issues not raised in the motion. *McManamon v. Washko,* 906 A.2d at 1274–1275 (appellant's argument that appellee's accident reconstruction expert should not have been permitted to rely upon conclusions contained in an OSHA report, was not properly preserved for review; although

---

**4.** The Court believes that the evidence discussed above is the evidence Plaintiff asserts was improperly excluded at trial. *See* paragraphs 3(g) and 11 of Plaintiff's Amended 1925(b) Statement. The Court ruled as a matter of statutory construction that the tow truck operated by Mr. Gladu was an "authorized vehicle" within the meaning of 75 Pa. C.S. § 6107 and 67 Pa.Code §§ 15.1–15.3. Having ruled on the issue, the Court properly precluded Plaintiff from presenting testimony that contradicted that ruling. "I also point out that having made a ailing on the law, it would be confusing to the jury to allow a witness to give them contrary instruction on the law." N.T. 6/1/11 AM, p. 16. "I made a ruling that this was not an illegal movement, how do I allow a witness to give contrary law to the jury without confusing the jury?" *Id.,* p. 17.

appellants attempted to exclude the OSHA evidence through a motion *in limine*, objected at trial, and also filed a post-trial motion on the issue, appellants never raised the specific argument that the OSHA references were not the type of evidence reasonably relied upon by experts in the field of accident reconstruction); *Commonwealth v. Kane*, 2010 PA Super 218, 10 A.3d 327, 333 (defendant's motion *in limine* argued for exclusion of evidence only on the basis of unfair prejudice under Pa.R.E. 403; defendant waived the argument that the evidence should have been excluded under the hearsay rule).

"The appellate court's job is to correct errors of law. If counsel never raised a point during trial, it cannot be said that the trial judge made an "error of law" needing to be corrected, even if some legal theory would have demanded that the trial judge erred." *McCloud v. McLaughlin*, 2003 PA Super 451, 837 A.2d 541, 543–544 (case citation omitted). Consequently, this issue is waived.

### D. *A "for profit" tow truck may be an "authorized vehicle"*

#### 1. "Used in the performance of public service or governmental functions"

Plaintiff recognized that 75 Pa.C.S. § 6107 "empowers PennDOT to define the types of vehicles that can be authorized after there is a *finding* that the vehicle is used in the performance of public service or governmental functions and to exempt such vehicles from certain provisions of the Vehicle Code as specified in DOT regulations." Plaintiff's Motion for Reconsideration, pp. 1–2 (emphasis added). Plaintiff, however, asserted that on a ease-by-ease basis, the trial court or the jury, but not PennDOT, must make the *finding* that the specific vehicle involved in each case was

being "used in the performance of public service or governmental functions" at the time the vehicle used a turnaround in the median. Plaintiff did not cite any authority for this assertion and failed to identify any case in which such a finding was made by the court or the jury.

The legislature gave PennDOT, not the trial court or the jury, the exclusive authority to determine which types of vehicles or groups of vehicles are "used in the performance of public service or governmental functions" within the meaning of 75 Pa.C.S. § 6107. In exercising that authority, PennDOT determined that tow trucks as a class perform "public service or governmental functions" and made *all* tow trucks Type I authorized vehicles in 67 Pa.Code § 15.2(1)(iii). "When a court reviews a regulation issued pursuant to an agency's legislative rule-making power, the court may not substitute its own judgment for that of the agency." *Tire Jockey Service, Inc. v. Comn., Dept. of Environmental Protection*, 591 Pa. 73, 108, 915 A.2d 1165, 1186 (2007).

Section 15.2(I)(iii), stating that tow trucks are Type I "authorized vehicles," is clear and unambiguous. "If the words of a regulation are clear and free from ambiguity, the letter of the regulation may not be disregarded under the pretext of pursuing its spirit." *Highway News, Inc. v. Penna. Dept. of Transp.*, 789 A.2d 802, 808 (2002).

In opposing the Defendants' motion *in limine*, Plaintiff consistently ignored that the definition of "authorized vehicle" in 75 Pa.C.S. § 102 *does not* have any language restricting such vehicles to only those "used in the performance of public service or governmental functions." Plaintiff did *not* argue that DOT's decision to include all tow trucks in § 15.2(1)(iii) was *invalid* and violated 75 Pa.C.S. § 6107, because § 15.2(*l*)(iii) does not expressly require the tow truck to be actually engaged "in

the performance of public service or governmental functions" at the time.

Instead, Plaintiff argued that the phrase "used in the performance of public service or governmental functions" from 75 Pa. C.S. § 6107, must be read into and become a part of § 15.2(1)(iii). "It is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include. Consequently, as a matter of statutory interpretation, although one is admonished to listen attentively to what a statute says; one must also listen attentively to what it does not say." *Hill v. Randolph*, 2011 PA Super 115, 24 A.3d 866, 869, (internal quotations, brackets, and citations omitted).[5]

[The overriding purpose of statutory interpretation] must be to ascertain and effectuate the legislative intent underlying the statute.... Generally, the clearest indication of legislative intent is the plain language of the statute itself. As we have stated:

To determine the meaning of a statute, a court must first determine whether the issue may be resolved by reference to the express language of the statute, which is to be read according to the plain meaning of the words. It is only when the words of the statute are not explicit on the point at issue that resort to statutory construction is appropriate. However, basic principles of statutory construction demand that when the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit, and legislative history

may be considered only when the words of a statute are not explicit. *Commonwealth v. Fedorek*, 596 Pa. 475, 484–485, 946 A.2d 93, 98–99 (2008) (citations and internal quotations omitted).

"As a general rule courts do not have the power to ignore clear and unambiguous statutory language in pursuit of a statute's alleged or perceived purpose. The Statutory Construction Act ... provides that, 'when the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.' 1 Pa.C.S. § 1921(b). Under § 1921(*o*), it is only when the words of a statute 'are not explicit' that a court may resort to other considerations, such as the statute's perceived 'purpose,' in order to ascertain legislative intent." *Commonwealth, Dept. of Transp. v. Taylor*, 576 Pa. 622, 628–629, 841 A.2d 108, 111–112 (2004) (citations and internal quotations omitted). "Where the words of a statute are clear and free from ambiguity the legislative intent is to be gleaned from those very words." *Id.*, 576 Pa. at 629–630, 841 A.2d at 112 (citations and internal quotations omitted).

Plaintiff's assertion that the phrase "used in the performance of public service or governmental functions" from 75 Pa. C.S. § 6107, must be read into and become a part of § 15.2(1)(i ii), was rejected by the Court because it violated these well-established rules governing the construction and interpretation of statutes and regulations.

### 2. "Public service"

In opposing the Defendants' motion *in limine*, Plaintiff argued that Mr. Gladu was not operating Bob Nolan's tow truck in the "public service" within the meaning

---

5. The rules of statutory construction set forth in the Statutory Construction Act of 1972 and the cases discussing those rules apply as well to the administrative rules and regulations codified in the Pennsylvania Code. 1 Pa.C.S. § 1502(a)(1)(ii); *Fraternal Order of Police Lodge No. 5 v. City of Philadelphia*, 139 Pa. Cmwlth. 256, 264, 590 A.2d 384, 387 (1991).

of 75 Pa.C.S. § 6107, and cited *Masloff v. Port Authority of Allegheny County*, 531 Pa. 416, 613 A.2d 1186 (1992). In *Masloff*, the Supreme Court affirmed an injunction preventing transit workers from striking because the public's health safety or welfare would he endangered by cessation of virtually all public transportation in the Pittsburgh metropolitan area. "The evidence established, inter alia, that public services, **such as** ambulance, fire, and police services, were severely hampered by the increased traffic congestion resulting from the strike." *Masloff*, 531 Pa. at 427, 613 A.2d at 1191 (emphasis added). The Supreme Court did not hold that "public services" are *limited* to *only* "ambulance, fire, or police services."

Plaintiff argued that "public service" can only be provided by governmental entities and not by for-profit commercial enterprises, citing *Black's Law Dictionary*. Other dictionaries, however, clearly indicate that "public service" is not limited to the government and includes commercial businesses.

Public service

1: **the *business* of supplying a commodity** (as electricity or gas) **or service** (as transportation) to any or all members of a community.

2: a service rendered in the public interest.

3: governmental employment; *esp:* civil service.

*Merriam–Webster's Collegiate Dictionary,* p. 1006 (11th ed.2005) (emphasis added).

public service-NOUN:

1. Employment within a governmental system, especially within the civil service.

2. A service performed for the benefit of the public, especially by a nonprofit organization.

3. **The *business* of supplying an essential commodity,** such as water or electricity, or a service, such as communications or transportation, to the public. *American Heritage Dictionary of the English Language* (2009) (emphasis added).

public service—*noun*

1. **the *business* of supplying an essential commodity,** as gas or *electricity,* **or a service,** as transportation, to the general public.

2. government *employment;* civil service.

3. a service to the public rendered without charge by a profit-making organization: *This radio program has been brought to you as a public service,* "public service." *Dictionary.com Unabridged.* Random House, Inc. 01 Jun. 2011. <Dictionary.com http://dictionary.reference.cormibrowsc/publicservice> (emphasis added).

"Resorting to standard dictionaries for definition of words in common usage without unique legal connotations is common practice." *Commonwealth v. McClintock,* 433 Pa.Super. 83, 93, 639 A.2d 1222, 1226 (1994) (using *Merriam–Webster's Ninth New College Dictionary* for the definition of "lure"). "Absent a definition, statutes are presumed to employ words in their popular and plain everyday sense, and popular meanings of such words must prevail." *Ruthrauff, Inc. v. Ravin, Inc.,* 2006 PA Super 352, 914 A.2d 880, 890 (relying on *Webster's Third New Int'l Dictionary* (1966) for the "plain meaning" of "unreasonable" and "reasonable").

The Court adopted the ordinary or common definition of "public service" as including businesses providing services, instead of the restrictive governmental-or-

iented definition in *Black's Law Dictionary.* Because Bob Nolan's Auto Service was a business supplying services to members of the community, Bob Nolan's fell within the meaning of "public service."

### 3. "The type of work which is the basis of the vehicle's designation"

Special operating privileges are granted to authorized vehicles only "when they are performing the type of work which is the basis of the vehicle's designation as an authorized vehicle in § 15.2 (relating to types of authorized vehicles)." 67 Pa.Code § 15.3(a). Plaintiff argued that Bob Nolan's tow trucks did not meet this requirement because they are not "used in the performance of public service or governmental functions." As demonstrated above, PennDOT has determined that tow trucks such a Bob Nolan's *are* "used in the performance of public service or governmental functions."

The correct interpretation of § 15.3(a) is that if a tow truck is not operating as a "highway service vehicle" or a "roadside-service vehicle" per § 15.2(1)(iii), the truck is not allowed to use the special operating privileges of § 15.3. For example, a person driving a tow truck to pick up dry cleaning during a lunch break is not operating the tow truck as a "highway service vehicle" at that time. During such an excursion, the driver would not be permitted to use the special operating privileges granted in § 15.3 and could not use the turnaround in the median.[6]

It is undisputed that Mr. Gladu, was actually engaged in a highway service or roadside-service operation (on his way to fix a stranded motorist's flat tire) when he used the median opening for a u-turn. *See* pages 28–31, below. Therefore, Mr. Gladu was "performing the type of work which is the basis of the vehicle's designation as an authorized vehicle in § 15.2." 67 Pa.Code § 15.3(a).

### 4. Judicial Notice

The Defendants' motion *in limine* asked the Court to take judicial notice, pursuant to Pa.R.E. 201(b), of the "fact" that Mr. Gladu's tow truck was an authorized vehicle that was permitted to use the u-turn opening in the median. Defendants were really asking the Court to determine, as a matter of law, that the tow truck was an "authorized vehicle" within the meaning of the statutes and regulations discussed above. That is an issue of statutory construction and not judicial notice.[7]

In granting the Defendants' motion *in limine* the Court expressly stated that she was merely deciding an issue of law and was not taking judicial notice of a fact.

MS. GALLAGHER [Plaintiff's attorney]: So are you going to be instructing them that there's a specific judicial notice of authorization to make that turn?

THE COURT: First of all, it is not judicial notice.... It is an issue of law.

MS. GALLAGHER: I thought their Motion was a Motion to take judicial notice,

---

6. This interpretation of § 15.3 was echoed in Mr. Gladu's later trial testimony. He testified that he could use the special operating privileges only when he was engaged in roadside service. "I feel I fall under the category of an emergency service vehicle when I'm doing my work. Now, on—if I'm just driving dawn 95, am 1 going to go in that left-hand lane? No. If I'm performing my work with my lights on

and doing what. 1 do, yes. Yes, I am." N.T. 6/6/11 PM, p. 78. *See* footnote 2, above.

7. It is interesting to note that paragraph 20 of the Plaintiff's motion *in limine* and page 11 of Plaintiff's supporting memorandum of law stated that "the Court can take judicial notice that Defendant Gladu's illegal u-turn constitutes negligence per se."

THE COURT: Well, they are wrong. It is not a judicial notice. It is for facts. This is a question of whether the tow truck was an authorized vehicle. That is an issue of the statute and the regs and the one case that was submitted which isn't on point.

And having said all that, the Court has made a ruling of law.

N.T. 5/31/11 AM, pp. 19–20.

### E. Whether a "flatbed tow truck" is a "tow truck" is waived

In paragraph 3(c) of his Amended 1925(b) Statement, Plaintiff asserts that "the plain and unambiguous language of 15.2 does not list or define flatbed tow trucks as the type of vehicle that can be authorized under 67 Pa.Code 15.2 nor grant them authority to exercise special exemptions as defined in 75 Pa.C.S.A. § 6107 and 67 Pa.Code § 15.1, 15.2, and 15.3." The specious nature of this issue is demonstrated by the admission by Plaintiff's attorney that "this is a tow truck. They are fixing flat tires." N.T. 6/13/11 PM, p. 11. This admission occurred while arguing against Defendant's nonsuit motion on the claims of negligent supervision and training.

This issue is waived because the first time Plaintiff raised this issue was in his 1925(b) Statement. "It is well settled that issues not raised below cannot be advanced for the first time in a 1925(b) statement or on appeal." _Irwin Union Nat. Bank & Trust Co. v. Famous_, 2010 PA Super 145, 4 A.3d 1099, 1104 (citations omitted).

Plaintiff did not raise the "flatbed tow truck" versus "tow truck" issue in Plaintiff's written opposition to the Defendants' motion _in limine_, or in Plaintiff's own motion _in limine_, in his motion for reconsideration, or in his argument on any of those motions. This issue is waived for

the same reasons the coordinate jurisdiction rule issue is waived, and the discussion of that issue at pages 16–18 is hereby incorporated by reference.

The "flatbed tow truck" versus "tow truck" issue is also waived because Plaintiff did not mention the issue in his post-trial motion. "If an issue has not been raised in a post-trial motion, it is waived for appeal purposes. Even when a litigant files post-trial motions but fails to raise a certain issue, that issue is deemed waived for purposes of appellate review." _Diamond Reo Truck Co. v. Mid–Pacific Indus. Inc._, 2002 PA Super 272, 806 A.2d 423, 428. "The failure to file post-trial motions cannot be excused or replaced by the filing of a 1925(b) statement. Thus, issues that are waived for failure to file post-trial motions or for other reasons cannot be revived or saved simply by raising those issues in a 1925(b) statement." _Id._, 806 A.2d at 430. This issue is waived.

### F. The Court decided an issue of law and left factual issues for the jury

Paragraph 3(d) of Plaintiff's Amended 1925(b) Statement states that it was a factual question for the jury to decide whether Mr. Gladu was operating his tow truck as a highway service vehicle or road-service vehicle at the time he made his u-turn in the median opening. In paragraph 3(e) of the Statement, Plaintiff posits that the Court erred because "the timing of the Trial Court's determination on the issue of actual authorization, as a matter of law, was premature and prejudiced the Plaintiff's entire case." Paragraph 3(f) of the Statement alleges that the Court erred in making

> before the start of trial ... a factual finding .... before any evidence was presented as to the type of work Defendant Gladu was performing and if that work fit within the definition prescribed

by the General Assembly at 75 Pa.C.S. § 6107, whether the u-turn was executed in a reasonable and safe manner, and whether Defendant Gladu took every safety precaution to insure the safety of all motorists.

All of these arguments ignore the salient fact that the *Plaintiff's* pretrial motion *in limine* also asked the Court to rule on the issue of actual authorization *before* the trial started, and rule that Mr. Gladu's u-turn was not authorized or permitted under the Vehicle Code.

Whether Mr. Gladu's tow truck was an "authorized vehicle" when it made the u-turn was a mixed question of law and fact. When presented with "a mixed question of law and fact ... the trial judge may make [the] determination as a matter of law in clear cases" when the facts are not in dispute. *Drum v. Shaull Equipment & Supply Co.*, 2001 PA Super 349, 787 A.2d 1050, 1061 (trial court erred in refusing to enter a nonsuit and letting the issue "go to the jury"), *quoting Emery v. Leavesly McCollum*, 1999 PA Super 26, 725 A.2d 807, 814 (*en banc*) (it was proper for the court to decide the issue in granting summary judgment). This was a clear case and Plaintiff had judicially admitted all of the operative facts when the Court granted the Defendants' motion *in limine*.

The only facts applicable to the legal decision of whether Mr. Gladu was operating an "authorized vehicle" were (1) was his vehicle a tow truck, and (2) was it operating as a highway service vehicle or road-service vehicle at the time it made the u-turn. 67 Pa.Code § 15.2(1)(iii) & § 15.3(a). Neither of these facts was in dispute because they had been admitted by the Plaintiff.

Plaintiff admitted that Mr. Gladu's vehicle was a "tow truck" in Plaintiff's motion *in limine* seeking a declaration that the tow truck was not an authorized vehicle. *See*, ¶¶ 13, 14 of Plaintiff's Motion at Control No. 11051354. Plaintiff expressly admitted that "Defendant Gladu was operating a flatbed tow truck owned by Defendant Bob Nolan's Auto Service, Inc., when he made a ... U–Turn on 1–95." Plaintiff's Answer to ¶ 2 of Defendants' motion *in limine* to have the tow truck declared to be an "authorized vehicle" at Control No. 11051360. The same admission is repeated in Plaintiff's Answer to ¶ 13 of the Defendants' motion *in limine*. Plaintiff refers to the vehicle as a "tow truck" in his Answers to ¶¶ 4, 7, 9, 14, 15, 18, 19, 24–25, 26 of the Defendants' motion *in limine*.

Paragraph 3 of the Defendants' motion *in limine* stated that when Mr. Gladu made his u-turn into the median opening:

James Gladu was, at that time, operating the tow truck in the course and scope of his employment with Bob Nolan's, as he was responding to a service call to provide roadside assistance to one of its members, whose car was disabled on Interstate 95 northbound, between the Academy Road and Woodhaven Road exits.

Plaintiff's Answer to Paragraph 3 of the Defendants' motion *in limine* stated:

It is admitted Defendant Gladu was in the course and scope of his employment with Bob Nolan's Auto Service Inc, when he was responding to a private call and made a reckless and illegal U–Turn on 1–95 in heavy traffic, swinging into the middle lane of traffic crashing into Plaintiff's oncoming vehicle.

Despite the hyperbole, Plaintiff's answer admitted that Mr. Gladu was on his way to assist a motorist with a flat tire on 1–95 North when he made his u-turn into the median opening. In responding to the Defendants' separate motion *in limine* to preclude evidence of AAA's priority call

policy, Plaintiff expressly admitted the following:

2. On September 24, 2007, Defendant, James Gladu, was operating a flatbed tow truck (hereinafter "tow truck"), owned by his employer-defendant, Bob Nolan's Auto Service, Inc. (hereinafter "Bob 'Nolan's") southbound on Interstate 95 between the Woodhaven Road and Academy Road exits.

3. **James Gladu was, at that time,** operating the tow truck in the course and scope of his employment with Bob Nolan's, as he was **responding to a service call to provide roadside assistance to one of the members of Co–Defendant, AAA Mid–Atlantic, Inc.** (hereinafter "AAA"), **whose car was disabled on Interstate 95 northbound, between the Academy Road and Woodhaven Road exits.**

Defendants' Motion in Limine at Control No. 11051363, ¶¶ 2, 3 (emphasis added). and Plaintiff's Answer thereto. Lastly, Plaintiff's Amended Complaint contained the following admission:

9. At all times relevant hereto, Defendant James Gladu was operating a 2007 International Navistar 4300, which was involved in the hereinafter-described collision with the express permission of its owner, Defendant Bob Nolan's Auto Service, Inc. and on the business of AAA Mid–Atlantic, Inc. **in response to a priority service call for a member of AAA Mid–Atlantic, Inc.**

Amended Complaint ¶ 9 (emphasis added). It is fair to say that Plaintiff has *always'* maintained that Mr. Gladu was on his way to rescue a stranded motorist with a flat tire when this accident occurred.

Consequently, it was not disputed that Mr. Gladu was performing the highway service or road service mentioned in 67 Pa.Code § 15.2(1)(iii) when the accident occurred. Because this was a clear case involving statutory construction and there were no disputed facts on this issue, the Court ruled as a matter of law that the tow truck operated by Mr. Gladu was an "authorized vehicle" within the meaning of 75 Pa.C.S. § 6107 and 67 Pa.Code §§ 15.1–15.3, and that he was "authorized" to use the turnaround in the median strip in furtherance of his road service efforts.[8]

Contrary to the Plaintiff's repeated assertions in his Amended 1925(b) Statement, the Court never ruled on the ***manner*** in which Mr. Gladu made his turn. The Court left it for the jury to decide whether Mr. Gladu "executed" his turn "in a reasonable and safe manner," and whether Mr. Gladu took "every precaution ... [to] insure the safety of all motorists and pedestrians" as he made his turn as required by 67 Pa.Code § 15.3(a). In denying the Plaintiff's motion for reconsideration, the Court assured Plaintiff's counsel that the Court would instruct the jury that the special operating privileges had to be executed in a reasonable and safe manner, and only if every precaution was taken to insure the safety of all motorists and pedestrians. N.T. 6/3/11 PM, p. 87.

In her closing argument to the jury, Plaintiff's attorney repeatedly stressed the dangerous nature of the u-turn and the evidence supporting her assertion that Mr. Gladu made the turn in a dangerous manner and without taking the necessary safety precautions. N.T. 6/16/11, pp. 36–45, 81–82. Using language from § 15.3(a), Plaintiff's attorney told the jury that the law

**8.** Plaintiff *did* dispute whether a tow truck operated by a for-profit company like Bob Nolan's was being "used in the performance of public service or governmental functions" within the meaning of 75 Pa.C.S. § 6107. That issue is discussed separately at pages 18–24, above.

obligated Mr. Gladu "to insure the safety of all motorists when he made that turn," *id.*, p. 37; and to take "every precaution to insure the safety of all motorists," *id.*, p. 82. Plaintiff's attorney squarely placed upon the jury the issue of deciding whether Mr. Gladu had made the turn safely:

> So the Judge is going to instruct you that he's only allowed to exercise that authorization if he's absolutely certain that he insures the safety of all motorists on that roadway. And that's the question for you, did he do that?

N.T. 6/16/11, p. 37.

The Court *did* instruct the jury that the special operating privileges had to be executed by Mr. Gladu in a reasonable and safe manner, and only if every precaution was attorney did not move to revoke his withdrawal of Plaintiff's motion *in limine* filed at Control No. 11051654. Plaintiff's withdrawal of his objections set forth in the motion *in limine* filed at Control No. 11051654, was a waiver of his right to later object to the admissibility of Mr. Fenton's testimony on those same issues. *Standard Penna. Prac.2d* § 56:7 (updated Dec. 2011), citing *Mellosky v. Eureka–Maryland Assur. Corp.*, 93 Pa.Super. 314, 318 (1928), and *Lynch Estate*, 427 Pa. 476, 480, 235 A.2d 412, 414 (1967) ("The trial judge . . . is best qualified to determine the import of counsel's 'withdrawal' " of an objection to evidence).

The written order disposing of Plaintiff's motion *in limine* filed at Control No. 11051654 states, "Granted in part & Denied in part. See transcript," The "granted in part" referred to the Defendant's elimination of Mr. Fenton's testimony concerning the animations and PC–Crash. The "denied in part" referred to the Plaintiff's withdrawal of the remainder of his motion.

## B. *Testimony based on the report of June 3, 2011*

Plaintiff argues that the Court erred in allowing Mr. Fenton to testify regarding the findings in his June 3, 2011 report. Plaintiff's accident reconstruction expert was Steven Marc Schorr, P.E. In a supplemental report dated May 20, 2011, Mr. Schorr critiqued Mr. Fenton's reports dated December 23, 2010, and February 9, 2011. Opening statements started on May 31, 2011.

Mr. Fenton lives and works in Colorado. Mr. Fenton returned to the accident scene on June 1, 2011, made additional measurements, and wrote a report dated June 3, 2011, responding to Mr. Schorr's comments. Mr. Fenton's June 3rd report added a new fact: there was a "dip" in the median. Mr. Fenton gave his June 3rd report to the attorney for the Defendants at 10:30 a.m. on June 3, 2011. Defense counsel then "provided it to counsel for plaintiff before Mr. Schorr went on the stand so he had an opportunity to read it." N.T. 6/3/11 PM, pp. 97–98. Mr. Schorr testified regarding some of the issues raised in Mr. Fenton's June 3rd report. However, at that time Mr. Schorr was not given the disk containing the technical data supporting Mr. Fenton's June 3rd report. Mr. Schorr later received and reviewed the data.

Plaintiff objected to Mr. Fenton testifying concerning the contents of his June and report before Mr. Fenton testified on June 14, 2011, N.T. 6/14/11 AM, pp. 36–45. It was clear that there was no prejudice to the Plaintiff because Plaintiff's attorney had thoroughly reviewed the June 3rd report with Mr. Schorr in the 11 days between receiving the report on June 3rd, and Mr. Fenton's testimony on June 14, 2011. The Court ruled as follows:

> 'THE COURT: All right. The report—obviously, Mr. Gallagher [Plain-

tiff's attorney], based on your discussion, you've had an opportunity to discuss this report with your expert.

MR. GALLAGHER: Yes, Your Honor.

THE COURT: You know what the flaws are, the strong points in Mr. Fenton's June 3rd report are. I will allow the report. Depending upon how it comes in, I will allow rebuttal.

N.T. 6/14/11 AM, pp. 44–45.

Mr. Schorr attended Mr. Fenton's testimony on June 15, 2011. At the conclusion of Mr. Fenton's testimony, Plaintiff's attorney told the Court that she intended to call Mr. Schorr as a rebuttal witness the next morning. Plaintiff's attorney made an offer of proof and stated that Mr. Schorr's "testimony will be limited to the turnabout and Mr. Schorr's measurements in this area together with a cloud—a point cloud presentation." N.T. 6/15/11 PM, p. 102. Plaintiff's attorney clearly believed that Mr. Schorr had sufficiently contradicted all of Mr. Fenton's other conclusions and opinions in Mr. Schorr's original testimony. On June 16, 2011, Mr. Schorr testified on rebuttal and limited his testimony to the subjects mentioned in the Plaintiff's offer of proof. Plaintiff does not suggest that the Court erred in any of its rulings concerning Mr. Schorr.

In Plaintiff's post-trial motion on this issue, Plaintiff's principal objections were that the new measurements Mr. Fenton made for his June 3rd report could/should have been made during his earlier visits to the scene and that the raw data from the latest visit was produced on June 15, 2011, and not on June 3rd with his report. As to the first objection, Mr. Fenton obviously did not think the measurements were significant until after he read Mr. Schorr's report. As to the second issue, Plaintiff did not identify any specific prejudice re-

sulting from the late production of the raw data. Plaintiff never demonstrated any effect the late production of the raw data had on Mr. Schorr's ability to testify on rebuttal. Plaintiff did not present any evidence that Mr. Schorr did not have sufficient time to study and analyze the report or the raw data before he testified on rebuttal on June 16.

There was no discovery violation in this case. Pa.R.C.P. 4003.5(c) expressly contemplates and permits an expert to supplement his report: an expert's trial testimony cannot exceed his "separate report, or supplement thereto." The preclusion of an expert's testimony under Rule 4003.5 is warranted only where there has been a complete failure to identify an expert witness before trial. *9 Goodrich–Amram 2d* § 4003.5(b):4.

Plaintiff should not have been surprised by Mr. Fenton's June 3rd supplemental report because it was merely a *rebuttal* to the issues which were first raised in the report of Plaintiff's own expert, Mr. Schorr. *Cf., Brady v. Ballay, Thornton, Maloney Medical Associates, Inc.,* 704 A.2d 1076, 1082 (Pa.Super.1997) (defense expert's trial testimony which exceeded fair scope of his pretrial report was properly admitted where it merely rebutted opinion of plaintiff's expert; such testimony could not have surprised, misled, or prejudiced the plaintiffs).

The record is devoid of any evidence of a willful violation of the discovery rules or bad faith by the Defendants. The Defendants did not hide the identity of their expert and did not attempt a "trial by ambush." On the contrary, Mr. Fenton's June 3rd supplemental report was necessary only because Mr. Schorr's May 20th supplemental report introduced new issues in responding to Mr. Fenton's two prior reports.

Prejudice is the most important factor in deciding whether an expert's testimony should be precluded or limited. "Prejudice" is defined as "any substantial diminution of a party's ability to properly present its case at trial." *Florig v. Estate of O'Hara,* 2006 PA Super 335, 912 A.2d 318, 325 (case citation omitted). "It should be emphasized that prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contentions; but that cannot be ground for exclusion." *Albert v. Alter,* 252 Pa.Super. 203, 214 n. 2, 381 A.2d 459, 465 n. 2 (1977).

Prejudice is not presumed to exist and actual harm must be proven before preclusion is appropriate. *Cf., Jacobs v. Halloran,* 551 Pa. 350, 357, 710 A.2d 1098, 1102 (1998). Where, as her; "a party has not acted in bad faith and has not misrepresented the existence of an expert expected to be called at trial, no sanction should be imposed unless the complaining party shows that he has been prejudiced from properly preparing his case for trial as a result of a dilatory disclosure." *Kearns v. DeHaas,* 377 Pa.Super. 200, 210, 546 A.2d 1226, 1231 (1988).

Plaintiff's attorney admitted he discussed Mr. Fenton's June 3rd supplemental report with Mr. Schorr before Mr. Fenton testified 11 days later. Plaintiff had ample time to prepare his cross-examination of Mr. Fenton and failed to identify how the cross-examination was substantially diminished due to receipt of Mr. Fenton's supplemental report on June 3, 2011. If Plaintiff suffered any prejudice, it was not apparent at trial. Mr. Fenton was properly permitted to testify concerning his June 3rd supplemental report. *See, Pratt v. Stein,* 298 Pa.Super. 92, 124, 444 A.2d 674, 692 (1982) (expert's testimony properly allowed where the plaintiff identified her expert witness in answers to defendant's interrogatories two days before trial); *Green Construction Co. v. Department of Transportation,* 164 Pa.Cmwlth. 566, 586, 643 A.2d 1129, 1139 (1994) (no prejudice from disclosure of the expert's identity and report five days before trial). *Cf., Brady,* 704 A.2d at 1082 (defense expert's trial testimony which exceeded the fair scope of his pretrial report did not prejudice, surprise, mislead, or prevent plaintiffs from preparing a response where it essentially rebutted opinion of plaintiff's own expert).

### C. *Failure to strike Mr. Fenton's testimony*

#### 1. Plaintiff's original motion to strike

Plaintiff contends that the Court erred in failing to rule on Plaintiff's motion to strike Mr. Fenton's trial testimony. Amended 1925(b) Statement ¶ 5. The Court did, in fact, rule on the Plaintiff's motion to strike. The Court did not rule on Plaintiff's renewed motion to strike, but that issue is waived for the reasons set forth below.

Mr. Fenton finished his direct testimony on the afternoon of June 14, 2011. Because of the lateness of the hour, the Court excused the jury until the next morning. Plaintiff did not move to strike Mr. Fenton's direct testimony until the following morning. In the argument on Plaintiff's motion to strike, the Plaintiff identified the following areas in which the Plaintiff believed Mr. Fenton's direct testimony was deficient:

- a general objection that Mr. Fenton's direct testimony failed "to provide any information or testimony regarding science;" N.T. 6/15/11 AM, p. 4.
- There was no evidence that Mr. Fenton did photogrammetry on a photo-

graph of the Plaintiff's van, except Mr. Fenton's testimony that he performed photogrammetry on the photograph. N.T. 6/15/11 AM, p. 5.

- Mr. Fenton "never quantifies the dip, never quantifies any measurements related to anything else other than the back end of the tow truck goes up 3 to 4 inches. There was no science used to support his testimony that the way the truck went into the dip raises the back of the bed up 3 to 4 inches." N.T. 6/15/11 AM, pp. 5–6.

Although both parties had ordered and received daily copies of the trial transcript, Plaintiff specifically identified only these two portions of Mr. Fenton's testimony as being deficient (*see* N.T. 6/15/11 AM, pp. 6, 10):

Q. Mr. Fenton, what, in your opinion, what causes the tow bar to be elevated three or four inches to cause the damage at point B on Mr. Keifer's van?

A. The tow bar is elevated when the tow truck dips down into the median.

N.T. 6/14/11 AM, p. 89 line 24 through p. 90 line 3.

Q. Sir, looking at now Defendant's Exhibit number 33, the photograph with the three points of damage, can you explain to us, bused upon your expertise in the area of photogrammetry looking at photographs and determining damage, what was the cause of the damage to point A, point 13, point C?

A. Okay, To do that, we did our vehicle match-up *and created this computer model to show how each one of those positions was created, and we went to great lengths to explain how A was created, and A is that notch that's taken out of the hood, and you can't quite see it because we're looking at the side of the vehicle here, But B was created by* *the tow bar because you see it's a lot lower and it's right around what we call the rocker panel on the vehicle. So, the rocker panel is this area down at the bottom—*

N.T. 6/14/11 AM, p. 89 line 24 through p. 90 line 3 (emphasis added). Plaintiff's objection to this testimony did not mention the italicized portion.

After lengthy discussion, the Court denied the motion to strike without prejudice to it being renewed at the conclusion of the Plaintiff's cross-examination of Mr. Fenton. N.T. 6/15/11 AM, p. 25. The Court denied Plaintiff's motion to strike Mr. Fenton's direct testimony because Plaintiff's complaints went to the weight and credibility of Mr. Fenton's testimony rather than its admissibility, Weight and credibility were issues best addressed through a vigorous cross-examination of Mr. Fenton and in the Plaintiff's closing argument, both of which the Plaintiff pursued.

Plaintiff cross-examined Mr. Fenton for 76 transcript pages, while the Defendants had him on direct examination for only 54 pages; both are exclusive of lengthy objections and sidebar conferences. On cross-examination the Plaintiff had the opportunity to elicit the numbers and calculations from Mr. Fenton at the time Mr. Fenton answered each of the Plaintiff's questions, but Plaintiff chose not to. If Plaintiff thought Mr. Fenton's answers were incomplete, Plaintiff had at least two ways to proceed, Plaintiff could have questioned Mr. Fenton further to elicit the details Plaintiff thought were lacking. Or, Plaintiff could use Mr. Fenton's lack of detail to destroy the validity and credibility of Mr. Fenton's opinions during the Plaintiff's closing argument to the jury. Plaintiff chose the second option.

The closing argument by Plaintiff's attorney derided Mr. Fenton's testimony for

its supposed lack of scientific support. For example,

> And even more importantly, we had the testimony yesterday of Mr. Fenton. At any point in his testimony did he explain the physics of a door coming off? The picture, the 3D fancy picture he showed you had the door already off. He never spent any time explaining to you how the physics in this incident could have taken the door off. In fact, in the picture he already has the door off. Does he think John Keifer was riding down 95 without a door on?

N.T. 6/16/11, pp. 32–33.

> Photogrammetry, I heard in Mr. Fenton's qualifications and I thought, wow, this is really special. We flew this guy in from Denver, we're going to get a show. And it took two-and-a-half hours of cross-examination and we saw that it was a tape measure against the white van.

N.T. 6/16/11, pp. 32–33. *See also, id.,* pp. 34–36.

The deficiencies in Mr. Fenton's direct testimony identified by the Plaintiff during the argument en Plaintiff's motion to strike went to the weight and credibility of Mr. Fenton's testimony. Plaintiff vigorously cross-examined Mr. Fenton on those points and argued to the jury that Mr.

Fenton's conclusions lacked support and were not credible. The Court properly denied the Plaintiff's motion to strike Mr. Fenton's direct testimony.

### 2. *Plaintiff's renewed motion to strike*

Plaintiff renewed his motion to strike Mr. Fenton's testimony at the conclusion of Plaintiff's cross-examination of Mr. Fenton. Plaintiff did not identify any additional issues or testimony to support his motion to strike Mr. Fenton's direct testimony. N.T. 6/15/11 PM, pp. 87–91.[9] The Court heard argument on Plaintiff's renewed motion but did not rule on it. *Id.* The Court put off further argument on the motion to take care of various other issues. Court then adjourned for the day without ruling on Plaintiff's renewed motion to strike Mr. Fenton's testimony. The next day, Plaintiff's attorney did not remind the Court that Plaintiff's renewed motion to strike had not been ruled upon. Instead, Plaintiff presented Mr. Schorr as a rebuttal witness, the parties gave their closing arguments, and the Court charged the jury.

Plaintiff did not preserve for review the issue of whether the Trial Court should have granted Plaintiff's renewed motion to strike Mr. Fenton's testimony. When the trial court overlooks or fails to rule on an issue, the party seeking the court's ruling

---

9. Plaintiff's attorney did raise the issue that Mr. Fenton's testimony on *cross*-examination "provided zero calculations as to how he talked about the front of the vehicle going into the dip and the back of the vehicle lifting up." N.T. 6/15/11 PM, pp. 90–91. However, when Mr. Fenton was on the stand testifying about this issue, *Plaintiff* asked the question en cross-examination, Mr. Fenton answered it, and Plaintiff seemed satisfied with the answer. Immediately after Mr. Fenton answered Plaintiff's question, Plaintiff did not object that Mr. Fenton's answer was non-responsive or was not sufficiently specific.

The general rule is that an objection and motion to strike will generally be rejected where the testimony sought to be stricken was elicited by the party objecting. Thus, a party may not object to, or have stricken, evidence that his attorney elicits on cross-examination, even if the evidence is inadmissible. *Commonwealth v. Manley,* 2009 PA Super 227, 985 A.2d 256, 270. *Accord, Commonwealth v. McDuffie,* 476 Pa. 321, 324, 382 A.2d 1191, 1192 (1978) (plurality) ("in general, a party is not entitled to have stricken incompetent evidence which that party elicits").

must remind the court that it has not ruled and obtain a definitive ruling on the issue. *Failing to do so results in the waiver of the issue not ruled upon. Faherty v. Gracias,* 2005 PA Super 174, 874 A.2d 1239, 1248–1249; *Blumer v. Ford Motor Co.,* 2011 PA Super 99, 20 A.3d 1222, 1233. In order to properly preserve the issue for review, the party must request a definitive ruling by the trial judge before allowing the case to go to the jury. *Boscia v. Massaro,* 365 Pa.Super. 271, 277, 529 A.2d 504, 507 (1987) (plurality).

Plaintiff never reminded the Court that it had not ruled upon Plaintiff's renewed motion to strike. Nor did the Plaintiff seek a definitive ruling on that motion. Plaintiff did not preserve for review the Court's failure to grant Plaintiff's renewed motion to strike Mr. Fenton's testimony.

### 3. *The additional grounds in Plaintiff's post-trial motion*

Plaintiff's post-trial motion identified 22 specific instances in **Mr. Fenton's** testimony that Plaintiff believed were deficient and warranted striking his testimony. *See* Post–Trial Motion ¶ 202–218. Eight of those instances occurred during Plaintiff's cross-examination of Mr. Fenton, and not during his direct examination by the Defendants.[10] Plaintiff's post-trial motion, paragraphs 197–202, identified what Plaintiff believed were deficiencies in Mr. Fenton's qualifications brought out during *voir dire*. However, Plaintiff did not object at trial to the Court accepting Mr. Fenton as an expert in the areas of accident reconstruction and photogrammetry. N.T. 6/14/11, p. 35.

The Trial Court's decision not to strike Mr. Fenton's testimony was based on the arguments presented by the Plaintiff at the time the motion was made. Plaintiff waived the additional arguments and issues set forth in the Plaintiff's post-trial motion and Amended 1925(b) Statement that were not presented to the Court when Plaintiff made his motion to strike Mr. Fenton's testimony. *See, e.g.,* ¶ 211 of Plaintiff's Post–Trial Motion. *Solomon v. Presbyterian University Hospital,* 365 Pa.Super. 447, 451, 530 A.2d 95, 97 (1987) (a party "may not, at the post-trial motion stage, raise a new theory which was not raised during trial"); *Coffey v. Minwax Co., Inc.,* 2000 PA Super 395, 764 A.2d 616, 622 ("It is well settled that a party may not raise an argument for the first time on appeal.... Since Appellants failed to raise the precise argument raised on appear before the trial court, we find the issue to be waived."),

Objections raised on appeal to an expert's trial testimony are waived if they were not presented to the trial court *during* the expert's testimony. *Betz v. Erie Ins. Exchange,* 2008 PA Super 221, 957 A.2d 1244, 1258. *See, McManamon v. Washko,* 906 A.2d at 1274 (appellants did not preserve argument that appellees acci dent *Bugosh v. Allen Refractories Co.,* 2007 PA Super 215, 932 A.2d 901, 913 (case citations omitted), *appeal dismissed as improvidently granted by Bugosh v. I.U. North America, Inc.,* 601 Pa. 277, 971 A.2d 1228 (2009)).

Paragraph 25 of the Plaintiff's Amended Complaint alleged the following claims of direct negligence against Bob Nolan's Auto Service:

(i) in negligently entrusting the defendant's vehicle to a careless driver who ignored the clearly marked signs and rules of the road;

---

**10.** Post–Trial Motion ¶¶ 202–204, 212–214 and 218, citing N.T. 6/15/11 Afternoon Session, pp. 43, 44, 47–48. 65–66, & 72. *See* footnote 9, above.

(j) in negligently hiring, training, screening, evaluating, monitoring, supervising, and retaining Defendant James Gladu or doing so in an inadequate manner;

(r) failing to instruct operators of tow trucks on safety precautions.

At the close of the plaintiff's case, Defendants presented the Court with a written Motion for Nonsuit seeking, *inter alia*, the dismissal of the above claims. N.T. 6/13/11 AM, pp. 126–131; *see* Control No. 11061821. The motion asserted that the Plaintiff failed to present any evidence that Bob Nolan's Auto Service (1) negligently entrusted its tow truck to Mr. Gladu, or (2) was negligent in "hiring, training, screening, evaluating, monitoring, supervising, and retaining Defendant James Gladu or doing so in an inadequate manner." Nonsuit Motion ¶ 20. In opposing the nonsuit, Plaintiff contested only the claims for negligent supervision and training. Plaintiff did not present any evidence or argue in support of the other claims and they were deemed abandoned.

The crux of the nonsuit motion was that there was no evidence that *Mr. Gladu* was not properly supervised by Bob Nolan's, or that *Mr. Gladu* was not properly trained. Although Plaintiff's evidence may have shown that other drivers for Bob Nolan's were not properly supervised or trained, there was no evidence that *Mr. Gladu* was not properly supervised or trained. The supervision and training, or lack thereof, received by the other drivers was irrelevant to the issues in this case because the other drivers were not operating the tow truck involved in this accident. The other drivers' lack of proper supervision or training could not possibly have been a proximate cause of this collision. Only evidence pertaining to the supervision or training of

*Mr. Gladu* was relevant to the issue of whether Bob Nolan's could be held legally responsible for negligently supervising or training *him*.

In opposing the nonsuit motion, the only facts identified by Plaintiff supporting his negligent supervision and training claims were the contract between AAA and Bob Nolan's Auto Service (Exhibit P–13), and the testimony of Thomas Taylor. N.T. 6/13/11 AM, p. 128; N.T. 6/13/11 PM, pp. 5–7. Plaintiff's post-trial motion and memorandum of law asserted additional reasons the nonsuit was improper. Those issues are waived because they were not presented to the Court during the argument on the nonsuit motion.

The AAA contract with Bob Nolan's did not require Bob Nolan's to train its drivers on the rules of the road or in the operation of their tow trucks on the highway. The AAA contract merely provided as follows:

1.2 *Training.* All Contractor drivers and roadside assistance personnel shall attend an initial two-day **customer service/technical** seminar and a one day refresher class annually conducted by Club at no expense to the contractor.

Exhibit P–13 p. 2 (emphasis added). Mr. Gladu did not attend the AAA seminars. N.T. 6/6/11 PM, p. 81.

Plaintiff did not present any evidence that Mr. Gladu's failure to attend the AAA customer service/technical seminar or refresher classes was a proximate cause of this accident. The only evidence as to the nature of the "technical" training was that it pertained to the use of the telephone-like D2ME messaging device that AAA supplied to the independent contractors to alert the tow trucks to the location of a service call. N.T. 6/8/11 AM, p. 48.

Plaintiff never presented any evidence as to the other subjects taught at the seminar and classes. More precisely,

Plaintiff did not present any evidence that the seminar and classes instructed the drivers not to use the turnarounds on 1–95. Consequently, Plaintiff presented no evidence that the subjects taught by AAA had any relevance to Mr. Gladu's use of the turnaround which, Plaintiff contends, was the cause of this accident.

Mr. Taylor was a supervisor on the staff of Robert Nolan, the owner of Bob Nolan's Auto Service. N.T. 6/2/11 AM, p. 29. Plaintiff called Mr. Taylor to testify as on cross-examination and afterwards he was not questioned by the Defendants. According to Mr. Nolan, Mr. Taylor's job included overseeing what went on in the office, taking care of the computers, and "he yells at the guys when I tell him to." N.T. 6/8/11 AM, p. 39. Mr. Taylor said he participated in the hiring of Mr. Gladu and that he had run a background check on Mr. Gladu. *Id.*, pp. 42–43, 49.

Mr. Taylor testified that he met with Mr. Gladu when Mr. Gladu starting working for Bob Nolan's and specifically told him the rules for safe driving that Bob Nolan's drivers must follow. He did this even though Mr. Gladu was an experienced tow truck driver who was coming to Bob Nolan's from another tow truck service. N.T. 6/8/11 AM, pp. 49, 51. Mr. Taylor specifically told Mr. Gladu that it was Bob Nolan's policy for its employees to drive safely and to not be in a hurry. *id.*, p. 51.

Mr. Taylor discussed the operation of the tow trucks on the highway with some of the drivers, Mr. Taylor said that Bob Nolan's did not give its drivers a training manual and he was not aware if the drivers received formal safety or driving training. N.T. 6/8/11 AM, pp. 47–49.

Plaintiff did not present the evidence necessary to require submitting to the jury the issue of Mr. Gladu's lack of "safety training" from Bob Nolan's. First, Plaintiff did not present any evidence as to which subjects should have been included in the "safety training" that Plaintiff's assert Mr. Gladu should have received, There is no evidence that failure to receive training in these unidentified subjects caused this accident.

Second, Plaintiff did not present any evidence on the subject of Mr. Gladu's experience being inadequate to the tasks of operating a flatbed tow truck on 1–95 and using the turnarounds. Even viewing the evidence in the light most favorable to the Plaintiff as the party opposing the nonsuit motion, there was no evidence in the record that Mr. Gladu was not a fully trained tow truck operator with many years of experience. The record demonstrated that Mr. Gladu came to Bob Nolan's as an experienced arid trained tow truck operator. N.T. 6/2/11 PM, pp. 20–21; N.T. 6/6/11 PM, p. 81. He did not need to be trained by Bob Nolan's. N.T. 6/6/11 PM, pp. 80–81. Before working for Bob Nolan's, Mr. Gladu worked for Superior Motor, Knights, and other companies that were Bob Nolan's competitors. N.T. 6/7/11 PM, pp. 26–27; N.T. 6/2/11 PM, pp. 20–21; N.T. 6/6/11 PM, p. 81 (other companies). Mr. Gladu is a professional driver and before entering the tow truck business, he drove five years for a street sweeping company. N.T. 6/6/11 PM, p. 62. Plaintiff did not inquire into the nature of Mr. Gladu's experience and failed to present any evidence that Mr. Gladu's experience had not sufficiently prepared him to make a u-turn in the turnaround.[11]

---

11. Plaintiff did not object, during the argument on the nonsuit or in post-trial motions, to the Court considering any of the evidence discussed in the text in ruling on the nonsuit motion. See, *Krentz v. Con. Rail*, 589 Pa. 576, 604, 910 A.2d 20, 36 (2006) (a *Nanty–Glo* issue is waived when it is raised for the first time on appeal and was not raised in the trial

In opposing the nonsuit, Plaintiff argued that it was a jury question whether this accident was foreseeable and thus create a duty to train Mr. Gladu regarding the turnaround. Plaintiff based this argument on Mr. Taylor's testimony that *prior* to the accident he had not instructed Mr. Gladu to avoid using the turnaround, and *after* the accident he told Mr. Gladu that the turnaround was dangerous. N.T. 6/13/11 PM, pp. 18–19.

There was no evidence in the record as to the foreseeability of accidents occurring at this turnaround. Plaintiff did not present any evidence that other accidents had occurred at this turnaround. Plaintiff did not present any evidence demonstrating that making a u-turn *into* this particular turnaround was dangerous, except Mr. Taylor's non-specific after-the fact statement.[12] Mr. Gladu testified that he had used this particular turnaround "numerous" times before the accident. N.T. 6/7/11 PM, p. 34. Even *Plaintiff's* attorney argued that Mr. Gladu had used this turnaround "hundreds of times" before this accident. N.T. 6/13/11 PM, pp. 5–6. There was no evidence that any of these previous u-turns resulted in accidents. This one accident was not evidence that Mr. Gladu lacked the necessary experience or that he was not properly trained or supervised.

In opposing the nonsuit motion, the only legal authorities cited by the plaintiff were § 213 of the *Restatement (Second) of Agency*, and *Heller v. Patwil Homes, Inc.*, 713 A.2d 105 (Pa.Super.1998). Section 213 states:

A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:

(a) in giving improper or ambiguous orders or in failing to make proper regulations; or

(b) in the employment of improper persons or instrumentalities in work involving risk of harm to others;

(c) in the supervision of the activity; or

(d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

*Restatement (Second) of Agency* § 213. "The Comment to section 213 provides that liability under this section 'exists only if all the requirements of an action of tort for negligence exist.'" *Brezenski v. World Truck Transfer, Inc.*, 2000 PA Super 175, 755 A.2d 36, 42, *quoting Restatement (Second) of Agency* § 213. *comment a.*

In *Heller*, home builder Patwil Homes was liable for the negligent supervision of its sales manager, William Strouse, who fraudulently induced prospective home buyers to privately invest with him for the alleged purpose of generating money for their houses. Strouse used his position, his employer's reputation, and his employer's client base to operate a fake illegal investment company out of his employer's office. The Superior Court ruled that since Strouse's activities went on for two months *in plain view of other Patwil employees*, coupled with a total absence of supervision or job training, the employer was on "constructive notice" that Strouse

---

court); *Lineberger v. Wyeth f/k/a American Home Products Corp.*, 2006 PA Super 35, 894 A.2d 141, 147–148, 149 (same).

**12.** The Court's ruling excluding testimony from other witnesses that *leaving* the turnaround was dangerous, is discussed at pages 70–71, below.

was engaging in illegal activity. *Heller,* 713 A.2d at 109.

The Plaintiff's reliance on *Heller* is misplaced. Plaintiff did not present any evidence that would have put Bob Nolan's Auto Service on "constructive notice" of the need to actively supervise Mr. Gladu. Mr. Gladu's driving did not occur within view of Bob Nolan's other employees or supervisors. Moreover, the u-turn made by Mr. Gladu into the turnaround was an authorized legal turn.

In determining Patwil's liability under § 213 of the *Restatement (Second) of Agency,* the Superior Court made two inquiries:

> (1) What was Strouse's conduct prior to obtaining investment money from the plaintiffs, and was it of such a nature as to indicate a propensity for illegal activity; and

> (2) Did the defendants know or, in the exercise of ordinary care, should they have known of Strouse's prior criminal conduct to alert them to his penchant for illegal activity?

*Heller,* 713 A.2d at 108.

A similar analysis of the present case provides no basis for imposing liability upon Bob Nolan's for negligent supervision or training. Plaintiff did not present any evidence that Mr. Gladu's conduct before this accident indicated a propensity for operating his tow truck in a negligent manner. Plaintiff also did not identify any specific facts that Bob Nolan's knew, or in the exercise of ordinary care should have known, that would have alerted Bob Nolan's to any pre-accident problems or red flags regarding Mr. Gladu's operation of the tow truck. Additionally, Mr. Taylor also performed a background check on Mr. Gladu, which he passed. N.T. 6/8/11 AM, pp. 42–43, 49.

Plaintiff's complete failure to present any evidence on these two issues required the entry of the nonsuit on the issues of negligent supervision and training. *Cf., R.A. v. First Church of Christ,* 2000 PA Super 58, 748 A.2d 692, 698–699 (affirming summary judgment in favor of defendant Church on plaintiff's claim under § 213 that the Church negligently supervised its minister, Dan-an Chick, who sexually abused R.A., a seven year old girl who lived on his street; there was "nothing in the record that could lead a jury reasonably to conclude that the Church failed to supervise or control Chick or that any better supervision or control would have prevented the abuse of R.A. There is no evidence of conduct by Chick of which the Church was aware that would have let it even remotely to suspect that Chick was a pedophile who was abusing a small girl who lived in his neighborhood. This is particularly true given that none of the abuse occurred on Church property.").

## IV. THE COURT PROPERLY DENIED JNOV

Plaintiff's post-trial motion requested a judgment notwithstanding the verdict ("JNOV") on the ground that there was insufficient evidence to support the verdict that Mr. Gladu was not negligent. Plaintiff separately requested a new trial on the basis that the verdict was against the weight of the evidence. The Court denied both requests.

Paragraph 9 of Plaintiff's Amended 1925(b) Statement asserts that the Court abused its discretion by denying Plaintiff's post-trial motion because "the jury's verdict